653 So.2d 857 (1994)
CIBA-GEIGY CORPORATION d/b/a Funk Seeds International
v.
Billy Fred MURPHREE and Charles Chrestman.
No. 91-CA-0386.
Supreme Court of Mississippi.
July 7, 1994.
As Modified on Denial of Rehearing April 20, 1995.
*858 W. Wayne Drinkwater, Jr., Lake Tindall & Thackston, J. Collins Wohner, Jr., Butler Snow O'Mara Stevens & Cannada, Jackson, Joseph C. Gibbs, Clarksdale, for appellant.
Stephen L. Henning, Bailey & Henning, Batesville, Cliff R. Easley, Jr., Easley & Cooper, Bruce, for appellees.
Rebecca L. Wiggs, Watkins & Eager, Jackson, Gary Jay Kushner, Mark D. Dopp, Hogan & Hartson, Washington, DC, Paul S. Minor, Minor & Guice, Biloxi, for amici curiae.
En Banc.
SMITH, Justice, for the Court:
Billy Fred Murphree and Charles Chrestman are farmers in Calhoun County. In 1986 they each planted milo seed of the variety G522DR marketed by Ciba-Geigy and purchased from a local merchant. During the course of planting each noticed that some of the seed seemed smaller than expected but each continued planting.
Chrestman contacted representatives of Ciba-Geigy because he was concerned that the seed was some other variety than G522DR. Representatives from Ciba-Geigy verified that the variety was G522DR by *859 checking the lot numbers on the bags against company records. When Chrestman was not satisfied with their oral representations, Bob Marshall and Jim Presley, representatives from Ciba-Geigy, signed a Special Warranty Agreement prepared by Chrestman's lawyer that the seed was of the variety specified.
The milo seed germinated well and made a good stand. When some of the milo failed to "head out" or form heads of grain, Chrestman and Murphree contacted representatives from Ciba-Geigy.
After both farmers produced low yields on their acreage, they filed suit against Ciba-Geigy alleging breach of warranty and negligence.
After a two week trial, the jury awarded Murphree $52,377.00 as actual damages based on the value of the crop if sold and $32,006.00 as consequential damages for the replacement cost of the milo for use as feed. Chrestman was awarded $26,801.14 as actual damages. Each was awarded $500,000.00 in punitive damages.
On appeal Ciba-Geigy raises the following issues:
A. NO PUNITIVE DAMAGES SHOULD HAVE BEEN AWARDED.
(1) PLAINTIFFS FAILED TO INTRODUCE EVIDENCE OF THE FINANCIAL CONDITION OF CIBA-GEIGY CORPORATION.
(2) NO PROOF OF WILLFUL OR WANTON MISCONDUCT SUPPORTS THE AWARD OF PUNITIVE DAMAGES.
(3) IMPOSITION OF PUNITIVE DAMAGES VIOLATED CIBA-GEIGY'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.
B. PLAINTIFFS FAILED TO PROVE MATERIAL ELEMENTS OF THEIR CASE.
(1) PLAINTIFFS FAILED TO PROVE THAT THEIR CROP LOSSES WERE FORSEEABLE AND COULD NOT REASONABLY HAVE BEEN PREVENTED.
(2) PLAINTIFFS FAILED TO ESTABLISH WITH REASONABLE CERTAINTY THAT THEIR CROP LOSSES WERE CAUSED BY SEED FROM LOT 932.
(3) PLAINTIFFS FAILED TO ESTABLISH THE AMOUNT OF THEIR DAMAGES WITH REASONABLE CERTAINTY.
(4) PLAINTIFFS' SEED SAMPLES WERE IMPROPERLY ADMITTED AND SHOULD NOT HAVE BEEN RELIED UPON.
(5) THE SPECIAL WARRANTY AGREEMENT CANNOT BE CONSTRUED TO INSURE CHRESTMAN AGAINST CROP LOSSES CAUSED BY OVERPLANTING.
(6) THERE IS NO PROOF PRESLEY OR MARSHALL HAD ACTUAL OR APPARENT AUTHORITY TO WARRANT AGAINST CROP LOSS FROM OVERPLANTING.
(7) MURPHREE WAS ALLOWED A DOUBLE RECOVERY FOR HIS LOST MILO.
Throughout this long trial, the evidence from both sides was that the crop failure was caused by adverse dry weather conditions and an excessive plant population. There was conflicting testimony as to the variation in seed size and the seed count per pound and whether the farmers were in a position to adjust their planters to compensate for the variance in size. There was no testimony that the seeds were not merchantable or did not germinate well.
On review, there is no proof which would justify the imposition of punitive damages.
Although the jury verdict for the farmers as to actual damages may be justified under the conflicting evidence, there is no basis for Murphree receiving both the sale price and the cost of replacement of the milo. This would amount to a double recovery.
The award of punitive damages is reversed and rendered. The award of excess or duplicative damages to Murphree of $32,006.00 is reversed and rendered. The other awards of actual damages to Murphree and Chrestman are affirmed.

*860 THE FACTS
In 1986, Billy Fred Murphree and Charles Chrestman, farmers in Bruce, Calhoun County, Mississippi, each planted a variety of milo seed known by the trade name of G522DR and marketed by Funk Seeds International, which is a wholly owned subsidiary of Ciba-Geigy Corporation. Murphree and Chrestman purchased the seed from Tedford Flying Service, a local supplier.
Just prior to finishing planting, Chrestman noticed that the seed in one bag appeared smaller. He testified:
I was pouring those seed in that drill; and I notice those little, dried up, brown-looking seed. I would tell the difference and I said, "Woe, they sent me the wrong milo."
Chrestman finished planting and contacted Tedford. Chrestman took a sample of the seed to Tedford and met with Bob Marshall, the sales representative of Ciba-Geigy. Chrestman expressed concern that the seed was not the G522DR variety but some other variety. David Tedford testified that "that biggest thing it seemed to me he was upset about was that it might have been two or three different variety of seed, and it might grow at different heights, and he might have a problem combining... ." Chrestman had saved all the bags and was able to give Marshall all the lot numbers of seed which he planted although he could not remember which lot number was on the small seed. Marshall told Chrestman that he would verify that the seed was the correct variety.
Not satisfied with the verbal representations by Ciba-Geigy, Chrestman had his attorney prepare a Special Warranty Agreement which Marshall and Jim Presley, regional sales manager, signed on behalf of Ciba-Geigy. The warranty provided in part as follows:
WHEREAS, the FARMER purchased Funk's G522DR Milo Seed from Tedford Flying Service... . During the planting of said milo seed the FARMER discovered that several of the sacks ... were found to contain very small seed appearing to be a different type of seed to the FARMER: and
WHEREAS, the FARMER, CHARLES CHRESTMAN, notified and brought a sample of said seed to Tedford Flying Service, and a portion of said sample was turned over to the District Sales Manager for FUNK'S SEED INTERNATIONAL, and said District Sales Manager has assured and warranted to the FARMER that all of said milo seed purchased by the FARMER, are in fact, Funk's G522DR Milo Seed, and there is not any difference in said seed, except as to the size, that are actually being planted; and
WHEREAS, ... if in fact any of said milo seed that has been purchased and planted by the FARMER are of a different variety, or does not grow and produce uniformly as the other Funk's G522DR seed purchased and planted by said FARMER, then said COMPANY agrees to reimburse and hold the FARMER harmless for all damages and expenses incurred, as a result of any difference in the seed, as sold to the FARMER as Funk's G522DR Milo Seed.
Chrestman planted his 334 acres with a grain drill and "drilled probably 98 percent" of the milo himself. Chrestman only noticed small seed in one bag. "That was the only bag I seen small seed." Chrestman did say that he "had four bags with that lot number on it in my empty sacks." He also said that believed he would have noticed any other small seed, "if they had been like that bag that I poured up at my place there."
Before he started planting, Murphree "noticed the seeds were extremely small." Murphree planted 486 acres of milo using a row type or flat plate planter. When Murphree noticed the smaller seed he checked his planting rate and found that his planter "was putting out a few too many seed."
Both plaintiffs' milo came to a good stand during the rainy weather of May and June, 1986. There was no problem with the seed germinating. However, the area experienced a period of below average rainfall in July and August. In most of the fields planted by Chrestman and Murphree the large stalks failed to "head out" or form heads of grain.
Chrestman and Murphree contacted Joe Goforth, the Calhoun County agent, who brought with him Dr. Charles Baskin, an *861 agronomist from Mississippi State University, to look at parts of the affected fields. Both Goforth and Dr. Baskin told the plaintiffs that the problem was caused by plant overpopulation and by drought. Dr. Baskin was called as an expert witness on behalf of Ciba-Geigy and repeated what he had told Chrestman and Murphree.
At trial, the plaintiffs' expert, Dr. Daniel Krieg, testified that the combination of extremely wet and extremely dry weather caused the overplanted milo to fail to produce grain. Krieg testified that the wet weather inhibited root development, leaving the milo vulnerable to the subsequent drought because of underdeveloped root structure. Krieg testified that if there had been average rainfall in July that the plaintiffs' milo would have produced an average yield.
Dr. Krieg's criticism of the milo seed was centered on Lot 932. This lot had been exposed to 3 or 4 nights of freezing temperatures during its 1985 growing cycle. Dr. Krieg stated that of the four lots only Lot 932 could have contained small seed. According to Dr. Krieg, if development of the seed is stopped prior to physiological maturity the seed can shrink and lose size. He stated that the small seed which was introduced as Exhibit P-7 was consistent with damage that stopped development prior to complete maturity of the seed.
The labelling on the bags of milo seed stated that there were approximately 12,500 seeds per pound. Dr. Krieg testified that Lot 932 would have more seed per pound. His testimony was as follows:
Well, I have not personally made size measurements, but I have made visual observations, and I would estimate that there's at least a twenty-five to thirty-percent reduction in size, which would mean that these small seed would have somewhere in the neighborhood of seventeen to 18,000 seed per pound instead of the 12,500 that you would expect to ... well, that the label on the bag said.
Dr. Krieg testified that "[i]t doesn't necessarily mean that the 17,000 is unmerchantable."
Dr. Krieg's opinion was that the excessive plant population was caused by the mixture of the small seed in Lot 932 with the seed from the other three lots. Dr. Krieg testified that the difference in seed size made it impossible to adjust the planting equipment to achieve an appropriate planting rate. He said that if all the seed had been small the farmers could have adjusted their planters to change the planting rate. Dr. Krieg testified that seed from Lot 932 would have had to have been in equal portions to normal seed to cause the results in the plaintiffs' fields, "somewhere in the fifty percent rage, fifty to sixty percent of the seed would have had to have been small seed to cause the problem we saw or see."
The results of seed counts on the lots of seed by Ciba-Geigy, using the representative samples which they are required by law to keep, showed that the average count on the "normal" lots ranged from 11,550 to 12,790 seed per pound. The count on Lot 932, an average of three samples, showed 14,900 per pound.
The testimony at trial was that seed size is not a recognized factor in the production of milo seed. There is no practice in the industry to evaluate seed as to size. The standard tests in the industry are for germination and vigor. Wesley Wilcox, Director of Quality Assurance with Ciba-Geigy, testified that the seed samples of Lot 932 were put through germination tests and found to be of good quality. Wilcox testified that the approximate number of seed per pound of 12,500 used on the label was derived from an average of samples and actual seed kernel counts over a period of nine or more years. Wilcox stated that there was nothing about the four seed lots that failed to comply with federal or state seed laws or any applicable industry standards.
Dr. Baskin testified:
In order to determine whether a product is mislabeled or not, you've got to have some standard by which to judge that mislabeling; and it was testified to in this case yesterday that the Mississippi pure seed law or the seed law act has any [sic] information whatever relating to the number of *862 seed per pound; therefore, I got no standard by which to judge what is labeling.
At the end of the two week trial the jury awarded Murphree $52,377.00 as the difference in the value of the crop if sold and $32,006.00 as the replacement cost of the milo that was used as feed. The first was called actual damages and the second consequential damages. Chrestman was awarded $26,801.14 as actual damages. Each was awarded $500,000.00 in punitive damages.

DISCUSSION

A. No Punitive Damages Should Have Been Awarded.

(1) Plaintiffs Failed to Introduce Evidence of the Financial Condition of Ciba-Geigy Corporation.
In C & C Trucking Co. v. Smith, 612 So.2d 1092 (Miss. 1992), decided while this case was pending, this Court overruled previous cases that made proof of a defendant's net worth a prerequisite for an award of punitive damages. The failure of the plaintiffs to introduce evidence of the financial condition of Ciba-Geigy Corporation was not error.
The plaintiffs did introduce the 1989 financial report of Ciba-Geigy, Ltd., a Swiss corporation of which the Ciba-Geigy Corporation is a subsidiary along with 134 other companies in 62 countries. Ciba-Geigy, the defendant in this case, is a New York corporation.
The financial report of Ciba-Geigy Ltd. was obtained by plaintiffs' counsel calling Ciba-Geigy directly and requesting "the most recent annual report." Ciba-Geigy Corporation is not publicly traded and apparently does not publish a separate annual report. Ciba-Geigy objected to the admission of the report arguing that it was not properly identified and did not represent the financial statement of the defendant corporation. Counsel for Ciba-Geigy had not seen the document before trial and "was just as surprised to see it as anybody else."
During closing arguments plaintiffs' counsel used the annual report to argue that the defendant's net worth was "in excess of 12 billion U.S. dollars." This figure represents the combined assets of all the companies in the Ciba-Geigy Group. There is no separate net worth of Ciba-Geigy Corporation in the report. This was the only financial information on corporate worth presented to the jury.
Although it is not necessary to submit financial information as a prerequisite to obtaining punitive damages, the discussions before the judge on the admissibility of the document do not show that plaintiffs' counsel had any basis for confusion as to the distinction between the two corporate entities.
In post-trial motion, the trial judge stated that he was concerned over the "receiving into evidence the financial statement of the defendant. Really it's not the defendant." The only proof concerning the relationship between the two companies was the 1989 financial statement which identified Ciba-Geigy Corporation as a wholly-owned subsidiary of Ciba-Geigy, Ltd. There was no proof that Ciba-Geigy Ltd. operated its subsidiary Ciba-Geigy Corporation in such a way as to ignore corporate separateness of the subsidiary.
The question of the separate identities of Ciba-Geigy, Ltd. and Ciba-Geigy Corporation has been considered many times by other courts and the separateness and integrity of the two corporations upheld each time. See Pitts v. Ciba-Geigy Corp., 616 F. Supp. 1495, 1497-1498 (D.Mass. 1985), and cases cited therein.
Under the holding in C & C Trucking Co. v. Smith, the proper use of evidence of the financial worth of a defendant is only as to the quantum of punitive damages. In order to challenge on appeal that an award of punitive damages is excessive, "evidence of net worth must be presented at trial, or error in the amount of punitive damages is waived." 612 So.2d at 1105.
Since neither party has produced evidence of the net worth of Ciba-Geigy Corporation, this Court cannot express an opinion as to the amount of the punitive damages.

(2) No Proof of Willful or Wanton Misconduct Supports the Award of Punitive Damages.
*863 In C & C Trucking Co., this Court again reviewed the prerequisites for punitive damages:
Punitive damages are properly allowed where the tort complained of was malicious, wanton, wilful, or capricious. Royal Oil Co., Inc. [v. Wells], 500 So.2d [439] at 450 [(Miss. 1986)]; Yazoo & M.V.R. Co. v. Williams, 87 Miss. 344, 355, 39 So. 489, 491 (1905); see also Newson v. Henry, 443 So.2d 817, 824 (Miss. 1983); T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481, 485 (Miss. 1972); Friendly Finance Co. of Biloxi, Inc. v. Mallett, 243 So.2d 403, 406 (Miss. 1971). Further, a finding of malice will give rise to an assessment of punitive damages.

Aetna Casualty & Surety Co. v. Day, 487 So.2d 830 (Miss. 1986); Weems v. American Security Insurance Co., 486 So.2d 1222, 1226 (Miss. 1986).
In determining the propriety of submitting the issue of punitive damages to the jury, the trial court decides whether, under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could find either malice or gross neglect/reckless disregard. Colonial Mortgage Co., Inc. v. Lee, 525 So.2d 804, 808 (Miss. 1988).
612 So.2d at 1102.
In the case sub judice, there is simply no evidence of any intentional, malicious or wanton conduct to justify an award of punitive damages. The proof showed that Ciba-Geigy sold some milo seed which was smaller in size than other seed sold. Milo seed, being a product of nature, regularly varies in size and there is nothing inherently wrong with smaller seed.
The testimony was that the seed in question, Lot 932, was tested and processed in accordance with standard procedure in the company and in the industry. The testimony from the experts was that the seed, although smaller, was merchantable. There is no conduct on the part of Ciba-Geigy which would compare with this Court's prior basis for awards of punitive damages.
The majority of the plaintiffs' arguments on this issue are erroneous and a gross mischaracterization of the evidence in the case. The testimony of Wesley Wilcox, Director of Quality Assurance for Ciba-Geigy, referenced as support, was that "physically it wouldn't be a problem to change screens ... but we have industry practices in regard to the size of the screens that we have used and we saw that there was no need to refine the size of the resulting crop that was going into the package any more than what we have done."
Another erroneous argument is that the plaintiffs proved "at trial that the Defendant violated the law of Mississippi." Although there was testimony that the seed count on Lot 932 exceeded the median 12,500 seed per pound labelled on the bag, there was no testimony or proof that this was a violation of law. To the contrary, Joe Hardy, Director of the Bureau of Regulatory Services of the Mississippi Department of Agriculture, who administers the seed laws of Mississippi, testified that there are no state regulations regarding the quantity labelling of seed. Hardy stated that no action would be taken on a complaint about the number of seed per pound. "This is not required labelling. It is permissible that it be put on there as a guide to the consumer in planting his crops."
Ken Roberts testified that "to the best of my knowledge there is no standard for seed size" and that "[s]orghum is not sized." Ken Walter, the former manager of administration and logistics for the southern business unit of Funk Seed International, testified that he was responsible for selecting the screens used in processing and that "in sorghum, it's not a sizing process."
Robert Fred Motley, former production manager for Funk Seed International, testified that to his knowledge there were no regulations pertaining to the number of seed or seed count per pound of milo seed.
Testimony from Ciba-Geigy showed that Lot 932 counted out to average 14,900 per pound. Dr. Krieg gave the opinion that "these small seed would have somewhere in the neighborhood of seventeen to 18,000 seed per pound instead of the 12,500 that you would expect." His seed count was based on *864 his guess work and not on an actual count or measurement.
Dr. Krieg's testimony was as follows:
Q. And there's no legal requirement with respect to seed size variation within a given commercial lot, is there, Dr. Krieg?
A. No legal requirement.
Plaintiffs' counsel objected and argued: "Your Honor, Mr. Gibbs [defense counsel] knows it is a violation of federal and state law to misrepresent certain things on these bags." Krieg then testified on cross examination that "there is nothing in the seed law that says sorghum has to be so many seed per pound."
The contention that this case comes under the "lying exception" on punitive damages has no legal or factual basis. Questions raised by the appellees of whether there was a shortage of G522DR during the Spring of 1986 and the circumstances of the purchase of additional seed from Crosbyton Seed Company are not questions related to imposition of punitive damages for sale of another lot of seed. Like Appellees' other arguments, the discussion plays fast and loose with the testimony in this case. There is no indication that Ciba-Geigy or its employees deliberately made any misrepresentations or that, if they had, this would have a bearing on the question of punitive damages.
Ken Walter testified: "Well, we actually produced a little more seed than we planned in 1984 for our 1985 crop; but the demand grew more than what we had expected." He was the one who contacted Crosbyton Seed Company in mid-December 1984 about purchasing additional seed. Funk purchased three million pounds. Delivery of the seed was taken in the spring of 1985.
The obvious problem with appellees' argument is that the seed was purchased from Crosbyton prior to the alleged freeze damage to Lot 932. The three million pounds were purchased and delivered in the 1985 sales season. The testimony clearly shows that the production of Lot 932 was a very small and insignificant part of the whole seed inventory. Funk was carrying over 55,000 bags whereas the whole Lot 932 was at most 2,400 bags. There is no evidence of any purchase of additional seed as the result of any lost production of Lot 932 or any change in company policy or procedure relating to the processing or marketing of this seed. The proof of shortage is absent from the record. In short, the whole notion of motive has no factual basis.
During closing argument, plaintiffs' counsel argued as justification for punitive damages that Mississippi had been used as a dumping ground for "bad, shriveled up damaged seed," and the jury as "the watch dog for Calhoun County" was to "send a message to Ciba-Geigy to Funk's to Wesley Wilcox of Quality Control that Mississippi is not going to be the dumping ground anymore for bad seed." Walters testified that Funk did not "select certain lots to go to certain areas or anything like that." This is another baseless argument by plaintiffs' counsel.
Plaintiffs allege that they "proved that Defendant's employees attempted to change the contents of the Defendant's internal data and memoranda relating to the defective seed in question so that it would appear that there was nothing wrong with the seed and so that it would appear that they did not have a shortage of Funk G522DR milo seed during the Spring of 1986 for sale to farmers such as Plaintiffs."
Plaintiff's contention is that defense witnesses changed their testimony at trial from their prior deposition testimony. First, there does not appear to be a change in testimony, and, second, the subject matter is not on a critical issue in the case.
Funk Seed International sold out its southern facilities to Delta and Pine Land Company on December 15, 1988. Most of the witnesses that plaintiffs' complain of were not "Defendant's employees," and there is no attempt to show an attempt to change the contents of internal data.
A memo from Ken Gill to Robert Motley shows 44 percent of "Total Production" of G522DR lost as a result of hail storm on September 22, 1985. Plaintiffs contend that there is a change in the testimony to this percentage of loss.
*865 Kenneth Lynn Gill, former production manager at Dumas from 1981-1986, testified by deposition excerpted by plaintiffs:
Q. Mr. Gill, in looking at the memo, dated October the 2nd, 1985, from you to Mr. Motley, and Mr. Bob Voelker, it appears that, as of the time you wrote this letter of October 2nd, 1985, that you had only been able to harvest 44 percent of your G522DR.
Is that  would that be right? As of  through September, I guess, of 1985?
A. It would be 44 percent of the acres.
... .
Q. '85, yeah. I am sorry. And that 1,066 acres represented, approximately, 44 percent of your total production, production of the G522DR?
A. Yes, sir.
Morgan Lewis Roberts, Jr., sorghum production manager at Dumas in 1986, testified at trial under cross examination by plaintiffs' counsel that the 44 percent total loss of production as a result of the hail storm on September 22, 1985 was "[i]n the Dumas area."
Robert Motley, production manager in Lubbock, Texas, testified that the lost production of G522DR due to the hail: "It represented about, I would say, about 30 at the most, 25 to 30 percent." He also said that "according to the memo, which did present 44 percent of the total acres at Dumas."
Wesley Wilcox, Director of Quality Assurance, testified at trial that the 44 percent of crop loss in 1985 "was 44 percent of the 522 production in the Dumas area. There were other areas where 522 was produced." "I have been told, all total on the inventory was 16 percent [loss]."
Three live witnesses testified that the 44 percent applied to the Dumas production and the deposition testimony does not contradict this. Since Gill was working in Dumas only there is no reason why this report would apply to any other location or that he would have reason to know or report on any other area than that which was his responsibility. The report clearly shows that it is about the Dumas, Texas production. Plaintiffs' argument that there was a change or that there is a contradiction is totally fictitious.
In arguing the jury instruction, plaintiffs' counsel argued about a change in the testimony of Ken Walters as bringing this case within the "lying exception" for punitive damages. At the time of trial and of his alleged false testimony Walters was employed by R.C. Young Seed Company and had been since January 1989. He was formerly the manager of administration and logistics for the southern business unit of Funk Seed International.
Walters' deposition as excerpted by plaintiffs included:
A. I believe that our seed supply was a little shorter than planned because of dry weather conditions in the production areas, in 1984.
Q. It would have, also, made a  where you would have to go out, and buy extra seed, is that 
A. Yes. It would have. It would have reduced our supply, yes.
At trial, Walters testified: "Well, we actually produced a little more seed than we planned in 1984 for our 1985 crop; but the demand grew more than what we had expected." On cross examination, Walters was asked about the difference in his deposition and trial testimony:
Q. Now, are you telling us something different from that today rather than shorter, it's more?
A. Yes. I reviewed the production records since 1989 and found it was actually more than what we planned.
Q. All right, sir, so we can mark that off as being incorrect. You made a mistake there; is that right?
A. That's correct.
In the time between the deposition in 1989 and the trial in 1991 Walters had found that his initial information was wrong. Even though Walters worked for Funk for 16 years this correction in testimony cannot be the basis of punitive damages against Ciba-Geigy.
The next alleged change in testimony concerned Morgan Roberts' testimony as to the *866 moisture sample taken on September 25, 1985, in the Dan Raymond field four where Lot 932 was grown. The reading was for 41.1 percent moisture. At issue is whether this reading was for the entire field or for one spot in the field. This is significant because Dr. Krieg used the 41.1 percent figure as the moisture for the entire field in reaching his conclusions.
Again, plaintiffs pitted deposition excerpted testimony against live witness testimony. Plaintiffs introduced this deposition testimony from Roberts:
Q. So the first moisture sample taken of this particular field in the fall of 1985 would have been taken September 25, 1985; is that right?
A. That is correct.
Q. And that was 41.1 percent moisture.
A. At that location in the field.
Q. Okay, it doesn't show where the location was, does it?
A. No, it doesn't.
At trial, Roberts testified: "Yes, we did pull moisture on September 25 on field number four... . It does not reflect the field moisture itself... . It reflects the moisture of a spot that was green in that field... . We felt the rest of the field was uniformly mature, being planted at the same time as field number one. We were using number one to save time. That represented both fields we felt as far as the moisture from field number four." During cross examination the following occurred:
Q. That's just something you've come up with since this trial started after talking to the attorney and other Funk's people that you feel like now, four years later, you remember; and that's what you did; isn't it?
A. At the time of the deposition I knew this 41.1 was the wet spot in the field.
Q. You didn't tell me that.
A. You didn't ask me.
The deposition testimony shows that Roberts limited the reading to one location in the field rather than the entire field. As Robert indicated, plaintiffs' counsel did not ask the right question or ask for explanation of the location of the reading. There does not appear to be any inconsistency. Also, at the time of trial, Roberts was not an employee of Ciba-Geigy or Funk. He was employed with Delta and Pine Land.
The next "deliberate falsehood or fabrication of a defense" alleged was a conflict over an answer to an interrogatory which came up during the testimony of Wesley Wilcox. Ciba-Geigy was asked by interrogatory to "identify fully and in detail the source, the year grown and harvester ... for the following lots of G522DR milo, to wit: DT925FE, DT928FP, FT932UP46, and DS176FP." The answer given was: "Lot number DS176FP was produced and harvested by Crosbyton Seed Company of Crosby, Texas under contract to Funk Seed International. The source of this seed was Funk Seed International." The repeated questioning by plaintiffs' counsel of Wilcox as to the accuracy of the answer does not show that the answer was a deliberate falsehood. As indicated by Ciba-Geigy, the proof at trial showed that the seed that Funk purchased from Crosbyton Seed Company showed that this seed was bought from Crosbyton Seed Company on the open market and was not grown from seed furnished by Funk Seed Company under contract with Crosbyton. The distinction between the trial testimony and the answer to interrogatory is too slight to have any significance considering that there was no question of damages as to Lot 176 or any of the seed purchased by Crosbyton.
As noted by defendant's counsel during oral argument, this Court has not previously allowed punitive damages for alleged trial misconduct. The proper response would be Rule 11 sanctions, bar complaint or perjury charges. To base punitive damages on a slight interpretation question on a collateral fact in an interrogatory answer would leave every case ever filed open to punitive damages. None of the alleged conduct said to justify this award in any way affected the plaintiffs in this case. This was all conduct subsequent to the filing of this lawsuit and which could not have been the basis for the allegation in the complaint. As previously noted, most of the witnesses were not in the employ of the defendant at the time of the *867 alleged perjury or misconduct. As defendant's counsel argued in oral argument, if this case is one in which punitive damages should have been considered then every case is one where punitive damages should be considered.
Under any analysis, the plaintiffs' allegations of conduct which would justify the punitive damages award are totally, completely, absolutely false. Even if any of the allegations were true they still would not justify any issue of punitive damages going to the jury.
While Mississippi law does allow punitive damages in breach of warranty cases, it is only "in rare instances." Fedders Corp. v. Boatright, 493 So.2d 301 (Miss. 1986). In addition to the breach, "there must enter into the injury some element of aggression or some coloring of insult, malice or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule." Id., quoting Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226 (1962).
"In one oft-quoted case, this Court opined that, as a matter of law, `ordinary torts, the product of forgetfulness, oversight, or the like,' do not `rise to the heightened level of an independent tort' which warrant the imposition of punitive damages liability." Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172, 1187 (Miss. 1990), citing State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242, 250 (Miss. 1985).
There is nothing alleged that could lead to the conclusion that Ciba-Geigy by malice, fraud, oppression or wilful wrong evinced a disregard of Murphree's or Chrestman's rights. The conduct did not rise to the requisite heightened level of tortiousness to warrant imposition of punitive damages. The award of punitive damages is reversed and rendered.

(3) Imposition of Punitive Damages Violated Ciba-Geigy's Right to Due Process Under the Fourteenth Amendment of the United States Constitution.
In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), which was decided while post-trial motions were pending in the present case, the United States Supreme Court expressed some reservation over the constitutionality of Mississippi's punitive damage procedure. In Haslip, the Court was looking at the Alabama system for awarding punitive damages.
Subsequently, in Ivy v. General Motors Acceptance Corp., 612 So.2d 1108, 1115-6 (Miss. 1992), this Court revisited the issue of the constitutionality of Mississippi's system for awarding punitive damages and rejected the idea that this state's system is unconstitutional. In making its comments in Haslip, the Supreme Court apparently had some misconceptions about Mississippi law which led to their unwarranted concerns.
There is no merit to this issue.

B. Plaintiffs Failed to Prove Material Elements of Their Case.

(1) Plaintiffs Failed to Prove That Their Crop Losses Were Foreseeable And Could Not Reasonably Have Been Prevented.
In this assignment the Appellant raises the question of the plaintiffs' entitlement to damages.
The testimony from both sides was fairly consistent that the reduction in crop yield was caused by a number of factors, but primarily the overplanting or overplant population, extremely wet weather and then drought or dry weather during a critical growing period. The overplant population was related to the size of the seed and the method of planting. All of these factors are closely related. But for the overplanting, there would have been less problem related to the lack of water and a potential for larger yield. Had the farmers known and/or been able to adjust their planting equipment to compensate for smaller seed there would have been no overplanting.
Both farmers testified that they were aware that they planted small seed. Murphree, in particular, acknowledged that he was aware that the seed was small before he began planting and knew he had planted *868 more seed than he intended. Neither farmer testified that the representation as to the number of seed per pound was the determining factor in his decision to purchase the seed or how to plant it. Both were aware of the effect of dry weather on the crops that they planted.
This case has two basic theories of recovery: negligence and breach of warranty.
The following is Instruction C-8 patterned after MJI § 36.01, defining negligence:
Negligence is the failure to use reasonable care. Reasonable care is that degree of care which a reasonably careful person or corporation would use under like or similar circumstances. Negligence may consist either in doing something that a reasonably careful person or corporation would do under like or similar circumstances.
Instruction C-9 defines reasonable care and Instruction C-10 further explains that reasonable care is a relative term and "must be viewed in the light of all the surrounding circumstances... ." The evidence does not show that Ciba-Geigy deviated from any degree of care in the production, processing, labelling or distribution of the seed. The procedures followed in Lot 932 were the same as in any other lot of seed.
The only seed in question is Lot 932. All other seed, especially the seed purchased from Crosbyton, was not shown to have presented any problem. This was confirmed by the plaintiffs' expert.
Although the terms "bad," "defect," and "defective" have been ascribed to the seed in Lot 932, this labelling is primarily post-harvest rhetoric. Seed, any seed, has two characteristics which are important for farming production purposes: germination and vigor. Lot 932 was tested for both prior to marketing and after this lawsuit and exceeded standards in both germination and vigor. Size, prior to this lawsuit, has not been considered as a factor in determining whether milo seed is suitable for sale. Every lot has some size variation. So long as the seed within the lot is comparably sized and the farmer makes the appropriate adjustment to his planter, which he must do anyway, then the seed will produce regardless of the size. It is only when the farmer mixes lots and/or fails to properly adjust his equipment that a problem may develop.
Without question Lot 932 was mixed with other lots of GR522DR variety. This mixing could have occurred at the distribution level, but most likely occurred at Tedford Flying Service, the supplier of the milo seed to Murphree and Chrestman. As noted by Dr. Krieg, had the two farmers planted totally from Lot 932 without mixing lots, there would have been no problem in overplanting. Their planters could easily have been adjusted for the smaller size seed. However, as Dr. Krieg testified, it was nearly impossible to adjust the planters with mixed lots of the GR522DR variety.
The jury was instructed adequately on negligence utilizing Instruction C-8. They were further instructed regarding reasonable care according to Instructions C-9 and C-10. There is sufficient evidence for the jury to find negligence on the part of Ciba-Geigy.
Appellant's argument begins with the assumption that the recovery of what was termed "consequential damages" by the plaintiffs and jury was for breach of warranty or contract. Under this theory there are requirements which the plaintiffs must meet. In Massey-Ferguson, Inc. v. Evans, 406 So.2d 15, 19 (Miss. 1981), this Court held:
Section 75-2-715(2)(a) defines consequential damages as follows: "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise... ." This section has been interpreted to allow a plaintiff to recover lost profits if the seller had reasons to know at the time of contracting that if he breached the contract, the plaintiff would be deprived of those profits. The subsection also imposes two restrictions in addition to foreseeability. The damages must be reasonably ascertainable and the plaintiff cannot recover for losses he reasonably could have prevented.
*869 In this case the breach was in the form of defective farm equipment and Evans incurred expenses incident to a soybean crop he was unable to recoup from sale.
In Wright v. Stevens, 445 So.2d 791 (Miss. 1984), the losses were from breach of a contract to build a swimming pool and the plaintiff sought to recover expenses over and above the original contract price. The Court followed the rule of foreseeability as a prerequisite to recovery from Hadley v. Baxendale, 9 Exch. 341, 156 Eng.Rep. 145 (1854), down through Massey-Ferguson, Inc. v. Evans and the Restatement of Contracts 2d (1979) §§ 351 and 352.
Upon discovery of a breach of warranty, the buyer has a duty to take reasonable measures to avoid further damages. If he fails to do so, the "losses attendant upon his continued" use of the product are "consequences of his own negligence and are not recoverable." FMC Corporation v. Strebeck, 196 So.2d 74, 78 (Miss. 1967).
There was testimony that variation in seed is to be expected. Dr. Krieg testified that a 10 to 15 per cent variation would not be objectionable and could be expected.
Chrestman found small seed in one bag but did not attempt to adjust his planter for the smaller seed. Murphree from the beginning knew that there was small seed. Despite this he did not adjust his planting rate even when he knew he was planting in excess of his normal rate of seed.
As testified to by Murphree and Joe Goforth, farmers should periodically check their actual planting rate rather than rely on reference to the seed-per-pound representations on the bag. Both Chrestman and Murphree testified that they checked their planting rates this way.
The jury could have concluded that Ciba-Geigy should have foreseen the problems related to the mixing of seeds from different lots where the sizes would prevent the farmers from adjusting their machinery to compensate accordingly. We will not disturb the jury's findings on disputed facts.

(2) Plaintiffs Failed to Establish With Reasonable Certainty That Their Crop Losses Were Caused by Seed from Lot 932.
Ciba-Geigy argues that the proof that the losses were caused by Lot 932 are too speculative. This Court has stated:
Ordinarily, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether or not the damages resulted from the act of which complaint is made or some other cause, or where it is impossible to say what of any portion of the damages result from the fault of the defendant and what portion resulted from the fault of the plaintiff himself.
Hudson v. Farrish Gravel Co., 279 So.2d 630, 636 (Miss. 1973).
Krieg's opinion was that the small size of the seed in Lot 932 caused overplanting. Krieg also testified that the seed size would explain the overplanting if the small seed constituted 50% of the seed planted. Based on their interpretation of the testimony, Ciba-Geigy argues that the 50-50 mix could not possibly have occurred.
Tedford received 147 bags of G522DR milo seed. Chrestman bought 61 bags of these milo seed from Tedford and planted 58 of these. Chrestman noticed smaller seed as he was planting his last field and only in one sack. Chrestman saved all the milo sacks and was able to determine that there were four different lots. When asked about the number of sacks with the same lot number as the small seed, Chrestman testified that he "had four bags with that lot number on it in my empty sacks." Based on this testimony, Ciba-Geigy argues that only four or five bags could have been from Lot 932. Murphree, on the other hand, had not saved any sacks and could not identify any lot numbers of seed planted.
Ciba-Geigy's argument is premised on evidence that only 42 bags of Lot 932 were received by Tedford and that the majority of these were sold to a third party prior to Chrestman and Murphree buying seed. During the testimony of Joyce Smithers Ciba-Geigy put into evidence delivery tickets to Tedford's Flying Service which showed lot numbers written on them after the delivery *870 of the seed to Tedford. The delivery ticket sheets which had been left with Tedford did not have the lot numbers written on them. Ms. Smithers testified that the person making the additional notations was now deceased and there was no way to determine when the notations were made.
In this case, the factual basis underlying the expert's opinion has not been disproved. The notations on the delivery tickets were evidence but not conclusive. There was simply a conflict in the evidence which the jury was called on and entitled to resolve.
There is no merit to this assignment of error.

(3) Plaintiffs Failed to Establish the Amount of Their Damages With Reasonable Certainty.
This Court has stated: "The rule that damages, if uncertain, cannot be recovered applies to their nature, and not to their extent. If the damage is certain, the fact that its extent is uncertain does not prevent a recovery." Merritt v. Dueitt, 455 So.2d 792, 793 (Miss. 1984), quoting Billups Petroleum Company v. Hardin's Bakeries Corporation, 217 Miss. 24, 63 So.2d 543 (1953).
Ciba-Geigy cites Stephens v. Brock, 568 So.2d 702 (Miss. 1990), as support. In that case the plaintiffs failed to put on evidence of net profits. The Court stated:
That a substantial loss occurred is unquestioned. However, the proof is vague as to the dollar amount of the loss even to the point of suggesting an intentional vagueness. Surely Brock and Worrell could have produced evidence more precise and proof more exact. Here there is no attempt to offer evidence of past profits, cost of production or marketing, but only proof of gross revenue anticipated. Thus the damages awarded were improper.
568 So.2d at 704-705.
Stephens cites to Leard v. Breland, 514 So.2d 778, 783 (Miss. 1987), for the rule that "the most generally accepted method for determining damages for such injury [to a growing crop] is to compute the difference between the value of the probable crop if there had been no injury and the value of the actual crop at maturity, less the expense of cultivation, harvesting and marketing that portion of the probable crop which was prevented from maturing."
Both Murphree and Chrestman established their damages by comparing the total milo they harvested in 1986 with the amount they reasonably believed based on their experience that they should have harvested. Both were farmers with many years experience in the growing of milo.
Murphree testified that he made an average of 5.43 bushels per acre. When asked his expected yield, Murphree testified that on the 486 acres he planted in G522DR he "would have been satisfied with 65 bushel." He testified that the government loan price was $1.83 per bushel and the difference between 65 bushels and 5.43 was 59.57. He calculated his loss as $52,377.
When Chrestman was asked his opinion as to what he should have made on his 334 acres, he testified that he "could have easily made 75 bushel to the acre." Chrestman testified that he made 11,625.6 bushels on his acres and that he "should have made around 25,000 bushel that year." He used a $1.98 per bushel price, which was the market price, and estimated his damages at $26,801.14. Chrestman also had some fields which he felt made good milo and he testified that the yields for 1986 averaged around 75 bushels per acre. Chrestman's opinion as to his expected yields was based on his many years experience in the farming industry and in raising milo for 20 years. Chrestman testified that he was one of the first people in north Calhoun County to farm milo.
Murphree's and Chrestman's opinions as to lost profits were not so speculative as to require reversal of these awards. The testimony showed that they had sufficient knowledge and point of comparison to make as accurate a calculation as can be made when dealing with losses of this kind. The jury award to Murphree of $52,377.00 and to Chrestman of $26,801.14 is affirmed.

(4) Plaintiffs' Seed Samples Were Improperly Admitted And Should Not Have Been Relied Upon.
Introduced into evidence during the testimony of Chrestman were two seed samples, *871 Exhibit P-7 and P-20. The testimony was that Chrestman took a sample of the seed he regarded as small to Tedford and some also to his attorney in a cup.
Chrestman identified P-7 as the seed he brought to his attorney as "a sample of those small seeds." Chrestman testified that he also took a sample of milo seed which he identified as good looking seed. He identified P-20 as the seed that he furnished or kept a sample of as part of the seed he purchased from Tedford.
Appellant's argument is really that the seed samples were not a sufficient basis for the testimony of Krieg. Appellant also argues that the chain of custody was not established to Krieg. However, both exhibits were introduced during the testimony of Chrestman who testified that he gave both samples, which he had personally taken from his planter and from seed purchased from Tedford, to his attorney. Chrestman was cross-examined at length about his authentication of the two seed samples.
The argument as to the reliability of Krieg's testimony has no place in the question of admissibility of these exhibits. All of the issues raised were ones susceptible to cross-examination during the testimony of the plaintiffs' expert which was much later in the trial than the admission of these exhibits. During the testimony of Wesley Wilcox, Ciba-Geigy also attempted to rebut this evidence with other samples of milo seed including samples from Lot 932 to show that the exhibit sample was not representative, but this exhibit was not introduced into evidence.
Specific objection to the admission of Exhibit P-7 was not preserved as a part of the record although it is apparent from the record that a bench conference was held to discuss the matter of Exhibit P-7 and that P-20 was objected to on the fungible nature of the exhibit.
Chrestman sufficiently authenticated the seed samples to meet the requirements of Miss.R.Evid. 901(a). There was no error in admitting the two exhibits.

(5) The Special Warranty Agreement Cannot Be Construed To Insure Chrestman Against Crop Losses Caused By Overplanting.
Ciba-Geigy contends that the Special Warranty Agreement which was signed by Marshall and Presley "cannot be interpreted to insure Chrestman against a loss resulting from overplanting and drought." Appellant argues that the instrument is unambiguous and the testimony at trial does not permit this interpretation. Appellant also argues that the agreement should not have been admitted into evidence and that jury instruction was improper.
There is no basis for concluding that the jury found that Ciba-Geigy insured Chrestman against loss from overplanting and drought. The effect of the agreement on the jury verdict is an unknown quantity. While Appellant alleges error, the specific point where an error occurred, if at all, is not specified.
The document was admitted during the testimony of Chrestman over the objection of defense counsel. There is little question that the agreement was properly admissible as part of the history of Chrestman's dealings with Ciba-Geigy. Chrestman, Marshall and Presley were all questioned as to the nature of their understanding of the agreement. The agreement, which was drafted by Chrestman's attorney, does not mention loss from overplanting or drought.
The jury was given two instructions covering the document, one from the plaintiff, Instruction P-C-4-B, and one from the defendant, Instruction D-10. Neither of these instructions mentions loss by overplanting or drought. Appellant has not pointed out any specific error which was made from which this Court can fashion a remedy.

(6) There Is No Proof Presley or Marshall Had Actual or Apparent Authority to Warrant Against Crop Loss From Overplanting.
As previously discussed it is not apparent that the Special Warranty Agreement was the basis for the jury verdict favorable to the plaintiffs. Ciba-Geigy argues that there was insufficient proof that Presley or Marshall had actual or apparent authority to bind Ciba-Geigy.
*872 In Mississippi, the burden of proving an agency relationship is upon the party asserting it. Woods v. Nichols, 416 So.2d 659, 664 (Miss. 1982); Highlands Ins. Co. v. McLaughlin, 387 So.2d 118 (Miss. 1980); U.S. Fidelity & Guaranty Co. v. Arrington, 255 So.2d 652 (Miss. 1971); Highlands Ins. Co. v. McLaughlin, 387 So.2d 118 (Miss. 1980).
Under Mississippi agency law, a principal is bound by the actions of its agent within the scope of that agent's real or apparent authority. Andrew Jackson Life Insurance Co. v. Williams, 566 So.2d 1172, 1180 (Miss. 1990); Ford v. Lamar Life Ins. Co., 513 So.2d 880, 888 (Miss. 1987) "If an agent acted within his apparent authority, the issue of actual authority need not be reached." Andrew Jackson, 566 So.2d at 1180.
In Andrew Jackson, 566 So.2d at 1181, this Court set forth the test for apparent authority:
To recover under the theory of apparent authority, a three-prong test must be met. Specifically, recovery requires a sufficient showing of: (1) acts or conduct on the part of the principal indicating the agent's authority, (2) reasonable reliance on those acts, and (3) a detrimental change in position as a result of such reliance. See Lamar Life Ins. Co., 513 So.2d at 888; Gulf Guar. Life Ins. Co. [v. Middleton], 361 So.2d [1377] at 1383 [(Miss. 1978)]; Clow Corp. v. J.D. Mullican, Inc., 356 So.2d 579, 580 (Miss. 1978); and cases cited therein.
The determination of apparent authority is a factual issue to be decided by the trier of fact. Andrew Jackson, 566 So.2d at 1181; Baxter Porter & Sons Well Servicing Co., Inc. v. Venture Oil Co., 488 So.2d 793 at 796 (Miss. 1986); College Ins. Co. of America v. Byrd, 367 So.2d 929, 930 (Miss. 1979); Clow Corp. v. J.D. Mullican, Inc., 356 So.2d 579, 583 (Miss. 1978).
The applicable standard of review is that the finding of the trier of fact will not be disturbed on appeal if there is substantial supporting evidence even if under the same proof we might have found otherwise. The finding of fact may not be set aside unless manifestly wrong. Dungan v. Dick Moore, Inc., 463 So.2d 1094, 1100 (Miss. 1985); Cotton v. McConnel, 435 So.2d 683, 685 (Miss. 1983).
Presley was the regional sales manager responsible for the State of Mississippi. Marshall was the district sales manager for Funk Seeds and Presley's supervisor. There was no proof offered of any actual authority. Appellant argues that there was no "reasonable reliance" in order to establish apparent authority.
Under McPherson v. McLendon, 221 So.2d 75, 78 (Miss. 1969) the plaintiff must prove that a reasonably prudent person, familiar with the usage of a particular business, would believe the agent to have such authority; that the plaintiff acted reasonable in relying on the appearance of authority; and that he did not know or have reason to know the true facts of the agent's authority.
The whole question of authority is one for the jury as trier of fact to resolve. There was sufficient supporting evidence from which a jury could conclude that there was apparent authority. It is not clear that such a finding was made, particularly since this determination would only have resulted in a finding for Chrestman. Since the jury returned a verdict for both plaintiffs, there can be no finding of error based on this question.

(7) Murphree Was Allowed a Double Recovery for His Lost Milo.
At trial Murphree offered two different valuations of his lost milo crop. He calculated the lost sale price based on the difference between his actual crop and expected crop using the government loan price, and he also gave the replacement cost of the lost milo using what he actually spent to buy alternative grain to feed his livestock. The jury awarded him both. Appellant correctly contends that this was double recovery and error.
Murphree calls one award "actual" damages and the other "consequential" damages. His primary defense is to claim that the Appellant failed to make a timely, contemporaneous specific objection and is now estopped. The cases cited by Murphree do not support this proposition. Under the facts of *873 this case, there is no legal basis for awarding other than actual damages and it was an error in law to submit this instruction to the jury. The Court recognizes the instruction as plain error.
As set out in Leard v. Breland, 514 So.2d at 783, the awarding of profits and expenses is a "double recovery." Clearly, Murphree could not both sell his milo and also feed it to his livestock. Generally, a plaintiff must choose among alternative methods of calculating damages so as not to be "unjustly enriched." City of Jackson v. Keane, 502 So.2d 1185, 1187 (Miss. 1987).
This award will not be allowed to stand. The award of $32,006.00 in consequential damages to Murphree is reversed and rendered.

CONCLUSION
There is some slight evidence from which the jury could have concluded that Ciba-Geigy negligently breached some duty owed to the farmers by marketing milo seed which was smaller than normal and when mixed with other lots of normal size seed, prevented adjustment of the farmers' planters, all of which resulted in overplanting of the milo. The awards of actual damages to both farmers consistent with their testimony will be allowed to stand. The award to Murphree of the replacement cost of his milo however would amount to a double recovery and the award to him of $32,006.00 is reversed.
The award of punitive damages cannot be justified under the facts of this case. There was no heightened and independent tortious conduct which would justify this additional award. The award of punitive damages is reversed.
The award to Chrestman of $26,801.14 in actual damages and to Murphree of $52,377.00 in actual damages is affirmed.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
McRAE, J., dissents with separate written opinion.
McRAE, Justice, dissenting:
I agree with the majority's opinion that both Billy Fred Murphree and Charles Chrestman are entitled to damages as a result of Ciba-Geigy Corporation d/b/a Funk Seeds International (hereinafter "Ciba-Geigy") marketing its smaller than normal milo seed as normal milo seed. I also agree that Murphree's award of $52,377.00 as actual damages and $32,006.00 as consequential damages is overlapping and a double recovery, but, as the majority points out, because Murphree proved both damages, he is entitled to the higher award of $52,377.00. I, however, disagree that the award of punitive damages cannot be justified. There exists in the record heightened and independent tortious conduct which does justify this additional award, and, accordingly, I dissent.
Both Farmer Murphree and Farmer Chrestman planted G522DR milo seed which was marketed by Funk Seeds International and ultimately by Ciba-Geigy, its parent company. Prior to final planting, Chrestman noticed that some of the G522DR seed was considerably smaller than the normal sized G522DR seed. Chrestman carried a sample of the deformed seed to Tedford Flying Service, the local supplier where he purchased the seed, and informed a Ciba-Geigy representative. As a result of his suspicions, Chrestman retained his attorney to prepare a Special Warranty Agreement. Bob Marshall, Ciba-Geigy's sales representative, and Jim Presley, its regional sales manager, signed the warranty which provided in pertinent part:
WHEREAS, the FARMER purchased Funk's G522DR Milo Seed from Tedford Flying Service ... During the planting of said milo seed the FARMER discovered that several of the sacks ... were found to contain very small seed appearing to be a different type of seed to the FARMER: and
WHEREAS, the FARMER, CHARLES CHRESTMAN, notified and brought a sample of said seed to Tedford Flying Service, and a portion of said sample was *874 turned over to the District Sales Manager for FUNK'S SEED INTERNATIONAL, and said District Sales Manager has assured and warranted to the FARMER that all of said milo seed purchased by the FARMER, are in fact, Funk's G522DR Milo Seed, and there is not any difference in said seed, except as to the size, that are actually being planted; and
WHEREAS, FUNK'S SEED INTERNATIONAL, by and through its District Sales Manager has warranted and represented to the FARMER, that if in fact any of said milo seed that has been purchased and planted by the FARMER are of a different variety, or does not grow and produce uniformly as the other Funk's G522DR seed purchased and planted by said FARMER, then said COMPANY agrees to reimburse and hold the FARMER harmless for all damages and expenses incurred, as a result of any difference in the seed, as sold to the FARMER as Funk's G522DR Milo Seed.

The COMPANY warrants and represents that it has every intention of standing behind this or any other warranty of its G522DR Milo Seed.
Murphree also noticed the smaller seeds when he planted but, however, testified at trial that he had his planter set in the slowest operable sprocket configuration and, as a result, could do nothing to decrease the number of seeds being planted. Seeing that their crops were not forming the appropriate heads of grain, both farmers notified Joe Goforth, Calhoun County's County Agent. Goforth, accompanied by Dr. Charles Baskin, an agronomist from Mississippi State University, examined the affected fields. Goforth and Baskin were of the opinion that the problem was due to overplanting. Farmers Murphree and Chrestman produced low yields on their acreage, and, subsequently, brought suit against Ciba-Geigy under breach of warranty, strict liability and negligence claims. Chrestman also pled an additional theory of recovery based on the aforementioned agreement which held him harmless for all incurred damages and expenses.
Expert witness Dr. Daniel Krieg testified at trial that the overplanting caused the milo's failure to produce grain. He stated that although there was water in the soil, the plants had not developed sufficient root systems in order to exhaust the water that was already in the soil, and, as a result, the seeds were literally fighting for room to grow. In testifying that the small seeds affected the planting, Dr. Krieg stated that when the planter was set at the appropriate setting for planting G522DR seeds, the smaller seeds fell through the hole and instead of planting one seed every time, the equipment planted two, thereby doubling the seeding rate.
Dr. Krieg's opinion was that lot number 932 of the G522DR seed purchased by the farmers was the culprit seed. He testified that lot number 932 was subjected to freezing temperatures for four nights during its growing cycle. The seed in question was not yet physiologically mature and due to the freeze, the seeds were prematurely stopped from developing. According to Dr. Krieg, there was a twenty-five to thirty percent reduction in size, and rather than having 12,500 seed per pound, as the label indicated, lot number 932 had approximately 18,000 seed per pound.
At trial, the jury found for the plaintiffs. Murphree was awarded $52,377.00 as actual damages and $32,006.00 as consequential damages. Chrestman was awarded $26,801.14 as actual damages, and both farmers were awarded $500,000.00 in punitive damages. The majority holds that Murphree is entitled to the $52,377.00 award, Chrestman is entitled to his actual damage award but neither is entitled to the punitive damage award. As stated previously, I agree with the majority opinion, but for the reversing of the punitive damage awards.
Punitive damages, under Mississippi law, are not to be awarded to a party for compensation of an injury but are to be awarded as punishment for the defendant's wrongdoings and so that others may be deterred from similar offenses. We have stated:
In Redden, Punitive Damages, § 5.2(A)(24), p. 356 (1980), we are told that in Mississippi:
Punitive damages are assessed by way of punishment against a defendant for *875 unlawful, malicious, wanton and reckless acts, and they are allowed by reason of undertaking to prevent its recurring in the future ... They are granted in the nature of punishment for the wrongdoing of the defendant and as an example so that others may be deterred for the commission of similar offense thereby in theory protecting the public . . Punitive damages may also be awarded if the damage was done by gross negligence that is equivalent to wilful and wanton mischief. Neal v. Newburger Co., 154 Miss. 691, 123 So. 861 (1929) .. .
C & C Trucking Co. v. Smith, 612 So.2d 1092, 1101-02 h(Miss. 1992) (emphasis added). See Wirtz v. Switzer, 586 So.2d 775, 783 (Miss. 1991); T.C.L. v. Lacoste, 431 So.2d 918, 923 (Miss. 1983). In addition, we have pronounced:
[I]t is long settled and uniformly adhered to rule in our jurisprudence that the amount of such punitory or exemplary damages is solely within the discretion of the jury, and, no matter what the sum of their finding might, interference therewith, unless for exceptional causes, is discouraged ... the courts should scrupulously avoid any undue interference with their prerogative.
Yazoo & Mississippi Valley Railroad Co. v. Williams, 87 Miss. 344, 355-56, 39 So. 489, 491 (1905). See Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1978).
Obviously, the question to be answered in the case sub judice is whether Ciba-Geigy's conduct amounted to at least gross negligence or reckless disregard for the rights of the plaintiffs. The answer to the question is a resounding yes. Both Chrestman and Murphree proved that Ciba-Geigy, at the very least, was grossly negligent in selling the small, shriveled freeze damaged Funk G522DR milo seed that caused plaintiffs' crop failures.
The G522DR milo seeds were advertised as the best on the market. Ciba-Geigy's advertisement stated, "Don't settle for less than the Number One selling grain sorghum hybrid in the U.S." and also promised uniform plants; however, this was not the case with Murphree and Chrestman's yields. Ciba-Geigy clearly breached its express warranty that the seeds were of good and merchantable quality, and further, Ciba-Geigy expressly promised in its warranty to Chrestman that it would "hold the farmer harmless for all damages and expenses incurred... ."
Evidence was produced that Ciba-Geigy knew that the seeds were not top quality seeds. Introduced into evidence were internal memorandums from Ciba-Geigy revealing that as a result of freezing temperatures, Ciba-Geigy was troubled about the possibility of freeze damage to lot number 932 of the G522DR seed. Dr. Krieg also testified that in both 1984 and 1985, defendant's G522DR seed was definitely freeze damaged due to the severe weather.
With the knowledge that the G522DR seed was possibly freeze damaged, Ciba-Geigy intentionally proceeded to market the seeds nevertheless. As proof that Ciba-Geigy needed all the seeds it could conceivably produce for sale in the 1986 market regardless of quality, Wesley Wilcox, Ciba-Geigy's Director of Quality Assurance, testified that a hail storm in 1985 destroyed forty-four (44%) percent total production of the G522DR seed. Moreover, because the weather damage to Ciba-Geigy's seeds was so severe during the growing seasons of 1984 and 1985, Ciba-Geigy was forced to buy three million pounds (3,000,000 Ibs.) of milo seed from another seed company in 1985. Ciba-Geigy then placed its label on the bought seeds and sold them as Funk seeds in 1986. When questioned about Ciba-Geigy's actions, Wilcox specifically provided that Ciba-Geigy was "trying to have inventory enough to meet the market demand."
The Mississippi Agricultural Seed Act provides in part:
(1) It shall be unlawful for any person to sell, offer for sale, or expose for sale any agricultural seed, mixtures of agricultural seed, vegetable seed, flower seed, or tree and shrub seed, as defined in this article, for seeding purposes within this state:

*876 (c) Not labeled in accordance with the provisions of this article, or having a false or misleading labeling or claim;
(d) Pertaining to which there has been a false or misleading advertisement.
Mississippi Code Ann. § 69-3-9 (1972) (emphasis added). There is no dispute that Ciba-Geigy labeled its G522DR seed bags as containing approximately 12,500 pounds of seed per bag. Murphree and Chrestman relied on the bags's label when they planted their crops. Contrary to the majority opinion that the farmers could have adjusted their planters to a smaller setting, thus reducing the number of seeds being planted, Murphree's testimony revealed that he had his planter positioned on the lowest setting in accordance with planing G522DR seed, and it was not possible to set it any lower so that less seed could be planted. Plaintiffs proved at trial that Ciba-Geigy violated Miss. Code Ann. § 69-3-9(1)(c) & (d) by falsely and misleadingly labeling the approximate number of seed per pound on the bags of G522DR milo seed.
Chrestman took cautionary measures when he noticed that the seed was small, shriveled and wrinkled. His attorney prepared a special warranty agreement and executed the agreement with Ciba-Geigy representatives. The representatives warranted that the seeds were the variety represented by Funk and were of good and merchantable quality. Chrestman was assured that the seeds would grow and produce uniformly as the other Funk's G522DR seed purchased and planted by him. This did not occur because Chrestman also planted the G522DR seed in other fields which produced good milo, and, thus, the special warranty agreement was breached. Ciba-Geigy willfully and intentionally refused to pay under the terms of the special warranty agreement, and this in itself represents a malicious tort. "Punitive damages are properly allowed where the tort complained of was malicious, wanton, wilful, or capricious." C & C Trucking Co. v. Smith, 612 So.2d 1092, 1102 (Miss. 1992). See Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 450 (Miss. 1986); Yazoo & M.V.R. Co. v. Williams, 87 Miss. 344, 355, 39 So. 489, 491 (1905).
Dr. Krieg testified that Ciba-Geigy can, through mechanical separation and genetic production, produce seed of a uniform size, which in turn gives them an average number of seed per pound. In addition, testimony from a Ciba-Geigy representative informed the jury that Ciba-Geigy had the ability to control the uniformity of seed size by maneuvering the seeds across a set of screens which would take out the extra large and extra small seeds. Ciba-Geigy willfully and intentionally or at least recklessly and negligently wronged the plaintiffs by placing the freezed damaged seed on the market. Such action is equivalent to an intentional tort, and, thus, entitles the plaintiffs to punitive damages. Accordingly, I dissent.