783 So.2d 724 (2000)
Stephen W. MILLER, Appellant,
v.
SHELL OIL COMPANY, Appellee.
No. 1999-CA-00216-COA.
Court of Appeals of Mississippi.
May 30, 2000.
Rehearing Denied January 16, 2001.
Certiorari Denied May 3, 2001.
*725 David N. Gillis, Wayne E. Ferrell, Jr., Jackson, Attorneys for Appellant.
Robert A. Miller, Stephanie M. Rippee, Jackson, Attorneys for Appellee.
EN BANC
KING, P.J., for the Court:
¶ 1. Stephen W. Miller appeals the decision of the Hinds County Circuit Court which granted summary judgment to Shell Oil Company in his premises liability action against Mary Jo Bueto, R.B. Wall Oil Company, Inc., and Shell Oil Company. On appeal, Miller contends that the trial court erred in granting summary judgment because there was a genuine issue of material fact regarding Shell's control over the truck stop where Miller was injured. We agree. Therefore, we reverse and remand for a trial on the merits.

FACTS
¶ 2. On January 12, 1995, as Miller refueled his work truck at the Bogue Chitto Truck Stop, he slipped and fell in oil or fuel located on the concrete near the fuel pumps. He sustained severe and permanent injuries including chronic cervical and thoracolumbar sprain, cervical spondylosis C3-4, disc displacement C4-5, and lumbar spondylosis.
¶ 3. The Bogue Chitto Truck Stop sold Shell Company products such as diesel fuel and gasoline dispensed from fuel pumps identified as Shell fuel pumps. Additionally, the truck stop sold Shell brand motor oil. Miller testified that he stopped at this particular truck stop on his route from Jackson to New Orleans because it offered the best grade of diesel fuel at the lowest price. Miller's employer, Bell South, had instructed him to purchase gas in this manner.
¶ 4. Mary Jo Bueto Moak Kellog testified that she leased the Bogue Chitto Truck Stop from R.B. Wall Oil Company and opened the truck stop for business in February 1994. The Bogue Chitto Truck Stop displayed Shell signs and emblems one of which was visible from Interstate 55 and accepted Shell credit cards but did not accept any other oil company credit cards. Additionally, James Doyle Powell, who was the president of R.B. Wall Oil Company during the time Bueto operated the Bogue Chitto Truck Stop, was a Shell dealer. According to her understanding of the terms of the lease with R.B. Wall Oil Company, Bueto was required to operate the truck stop as a Shell fuel station. From inception, Shell signs were at the truck stop and only Shell brand of fuel was sold. Additionally, Bueto and Powell negotiated to make the fuel prices at the truck stop economically attractive to customers.
¶ 5. During the time Bueto operated the truck stop, Kenneth Wayne Powell was vice-president of R.B. Wall Oil Company which purchased fuel from Brookhaven Equipment Company under a verbal agreement that required that fuel delivered to Bogue Chitto Truck Stop be branded Shell fuel. This fuel came from the Shell terminal located in Collins. Kenneth Powell and Mike Clark of Brookhaven Equipment Company verbally agreed to brand the truck stop as a Shell fuel station. Therefore, the Bogue Chitto Truck Stop could not have operated under any brand other than Shell.
¶ 6. Shell sold fuel to Brookhaven Equipment Company under a written jobber *726 contract between those parties. The contract specified that Brookhaven Equipment Company and its purchasers, including Wall Oil and Bueto, had the right to use the Shell trademark and brand name to identify and advertise Shell fuel for resale to customers. Under the contract, Bueto was required to use the Shell trademark and brand name in such a way as to not cause any deception or confusion to prospective customers.
¶ 7. Although Bueto was not a formal party to the jobber contract, nonetheless she was required to operate the Bogue Chitto Truck Stop according to the following standards of operation: to diligently and efficiently merchandise and promote fuel under the Shell brand so as to maintain the good reputation and public acceptance of Shell fuel; to perform mechanical and service work in a workmanlike manner; to maintain an adequate and competent staff of employees; to conduct the station in a professional and business-like manner to minimize customer complaints; to maintain the station in a good condition and repair and keep the premises neat, clean and orderly; to keep the premises clear of equipment or obstructions which might restrict traffic flow, endanger customer safety, or detract from appearance; to use sufficient lighting and illuminated signs; to display signs identifying the products and services offered; and to maintain the premises according to Shell's "Appearance Guide." If these standards were not followed or if Bueto failed to meet the conditions of the jobber contract that concerned the operation of the service station, the right to use the Shell trademark and brand name at the Bogue Chitto Truck Stop could have been terminated by Shell.
¶ 8. Miller claims that Bueto, Wall, their employees, agents, and servants, acted as the employees or agents of Shell in selling Shell products and conducting a business enterprise holding itself out to its customers as a Shell station. On the other hand, Shell claims that a provision of the jobber contract precludes any exercise of control by Shell over the conduct or management of the purchaser's business, even though the jobber contract provides that Shell has the right to enter the Bogue Chitto Truck Stop to inspect the premises and to ensure Bueto's compliance with its provisions. Additionally, Shell claims that the jobber contract is not evidence of an agency relationship with Bueto and that the presence of Shell products and signs does not justify imposition of vicarious liability. Furthermore, the jobber contract also requires that Brookhaven Equipment Company defend and indemnify Shell against all claims arising out of any injury caused by or happening in connection with the sale of Shell gasoline and fuel oil.
¶ 9. On February 20, 1997, Miller filed suit against Mary Jo Bueto, R.B. Wall Oil Company, Inc., and Shell Company. After a hearing, the Hinds County Circuit Court granted Shell's motion for summary judgment on November 18, 1998. Feeling aggrieved, Miller filed this appeal.

DISCUSSION
¶ 10. Summary judgment is a powerful tool which "should be used wisely and sparingly." Martin v. Simmons, 571 So.2d 254, 258 (Miss.1990). It should only be granted when "there is no genuine issue as to any material fact." M.R.C.P. 56(c). When reviewing a decision to grant summary judgment, this Court will review the case de novo. Crain v. Cleveland Lodge 1532, 641 So.2d 1186, 1188 (Miss.1994). All evidentiary matters are viewed in a light most favorable to the non-movant. Id. In other words, Shell must show that there is no issue of fact concerning the existence of an agency relationship between *727 Shell and Bueto. In the case sub judice, Shell has not met this burden.
¶ 11. At issue here is whether an agency relationship existed between Bueto and Shell when Miller was injured at the Bogue Chitto Truck Stop, a Shell branded station leased by Bueto. "The determination of apparent authority [in an agency relationship] is a factual issue to be decided by the trier of fact." Ciba-Geigy Corp. v. Murphree, 653 So.2d 857, 872 (Miss. 1994). Under Mississippi agency law, a principal is bound by the actions of its agent within the scope of that agent's real or apparent authority. Id.
¶ 12. To determine whether Bueto was an independent contractor or an agent of Shell, several tests must be considered:
[w]hether the principal master has the power to terminate the contract at will; whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment; whether he furnishes the means and appliances for the work; whether he has control of the premises; whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output; whether he has the right to prescribe and furnish the details of the kind and character of work to be done; whether he has the right to supervise and inspect the working during the course of the employment; whether he has the right to direct the details of the manner in which the work is to be done; whether he has the right to employ and discharge the subemployees and to fix their compensation; and whether he is obliged to pay the wages of said employees.
Kisner v. Jackson, 159 Miss. 424, 428-29, 132 So. 90, 91 (1931). None of these tests alone is more important than another. Id.
¶ 13. Under an analysis of the Kisner factors in the case sub judice, Shell furnished the means, appliances, and materials of the work since Shell furnished its own brand of gasoline to the truck stop. For example, Bueto's arrangement with Wall required her to operate the truck stop as a Shell station which sold Shell gasoline and fuel to the exclusion of any other brand. Additionally, Bueto was required to buy all of her fuel from Wall and to sell that fuel as Shell branded fuel. Kenneth Wayne Powell stated in his deposition that Wall had an oral agreement with Mike Clark of Brookhaven Equipment Company that the Bogue Chitto Truck Stop would be a Shell fuel station.
¶ 14. The right of inspection is also one of the Kisner factors to be considered and under the provisions of the jobber contract, Shell had the right to inspect the operations conducted at the Bogue Chitto Truck Stop to assure compliance. If Bueto failed to comply with the terms of the jobber contract upon inspection by Shell, Shell could have removed the Shell trademark and brand name from the truck stop.
¶ 15. Control of the premises, the right to prescribe and furnish the details of the kind and character of work to be done, and the right to direct the details of the manner in which the work is done are additional Kisner factors to consider in the present case. Bueto was required to merchandise and promote Shell products so that Shell's good name and reputation would be maintained. She was also required to perform mechanical and service work in a workmanlike manner and to use first class new materials and parts. To meet Shell's operation and appearance standards according to Shell's "Appearance Guide," Bueto had to employ adequate and competent employees. Bueto was required to maintain the truck stop, including sidewalks, drive-ways, *728 easements, landscaped areas, restrooms, and her own personal property in a neat, clean, and orderly manner that was also in good condition and repair. Bueto also kept the truck stop free of vehicles, equipment, and obstructions in order to assure the unrestricted traffic flow while maximizing customer safety and maintaining a neat appearance. Furthermore, sufficient lighting and illuminated signs were required for full visibility. Although three of the Kisner factors are lacking in this analysis-the power to fix prices, the right to hire and terminate employees and set wages and the right to pay wages-Shell exercised control in seven of the Kisner factors.
¶ 16. The appellee relies on Levine v. Standard Oil Co., Inc., 249 Miss. 651, 651, 163 So.2d 750, 751 (1964) for the proposition that the Mississippi Supreme Court rejected an apparent agency relationship between a company whose products were sold on the premises and the operators of the premises. In Levine, the court found that Standard Oil neither exercised nor retained control over the operation of the filling station and was thus not liable for the negligent acts of the operator. Levine is distinguishable from the case at bar because in Levine it was undisputed that Standard Oil's representatives did not control or supervise the station and in fact the lessee was his own manager. In Levine, the presence of Standard Oil signs and similar emblems on the uniform of the station attendants were by themselves insufficient to establish an agency relationship.
¶ 17. Shell also cites Fruchter v. Lynch Oil Co., 522 So.2d 195, 200 (Miss.1988), for the assertion that it cannot be held vicariously liable in the present case. The plaintiff in Fruchter was injured by hot water that sprayed from an overheated car radiator opened by an employee at the By-Pass Shell station in Oxford. Fruchter is also distinguishable from the case at bar because Fruchter sued both the operator of the Shell station and Lynch Oil but not Shell itself. In Fruchter, the court found that Lynch Oil was entitled to summary judgment as a matter of law since Fruchter failed to establish a factual premise upon which the court could hold that Lynch Oil had legal responsibility for an employee's negligence. The court also noted that Lynch Oil did nothing to entice Fruchter to come upon the premises with the thought that she was doing business with it, i.e., Lynch Oil did not hold itself out to the public as a Lynch Oil station but instead the operator was doing business as a Shell station. Notably, the court acknowledged that the facts of the Fruchter case might point the finger at Shell but declined to resolve a question not before it.
¶ 18. Elder v. Sears, Roebuck & Co., 516 So.2d 231, 235 (Miss.1987), is analogous to the present case. In Elder, insignia indicating "Sears" were prominently displayed on the premises leading customers to believe they were dealing with Sears. Id. The supreme court compared the facts of Sears to the Kisner factors and determined that Sears had the power to terminate the contract at will, fix prices, control the manner and time of payment, furnish signs for advertisement, require that the merchant maintain the premises in a safe, clean and attractive condition, and the right to inspect documentation of the merchant at reasonable times to determine compliance with the terms and provisions of the agreement. Id. at 234. However, Sears did not control the premises, direct the details of the manner in which the work is to be done, employ or discharge employees, fix compensation, or pay wages of the employees. Id. at 234-35. Here, the premises of the Bogue Chittto Truck Stop was arranged so that members of the consuming public thought they were dealing *729 with Shell. Similarly, as discussed above, Shell exercised control in seven of the ten Kisner factors. Shell, along with anyone of common sense, well knows that the volume and profitability of the business would be significantly less if the sign merely read "Bogue Chitto Truck Stop" without any Shell signs. Id. Here, the Shell name supplied the magic that attracted customers like Miller. Shell, notwithstanding the provision in the jobber contract purporting to shield it from liability, had indicia of control and induced members of the public doing business with its agent to believe they were doing business with Shell. However, the supreme court stated that: "If a party holds itself out as offering services to the public and if consumers are reasonably led to believe that they are doing business with that party, a private undisclosed agreement may not be used to thwart a plaintiffs action." Fruchter v. Lynch Oil Co., 522 So.2d 195, 200 (Miss.1988).
¶ 19. Shell claims that there is no genuine issue of material fact relating to the existence of an agency relationship between Shell and Bueto. On the other hand, Miller claims that Shell exercised sufficient control over the Bogue Chitto Truck Stop to create an agency relationship between Shell and Bueto. Since a genuine issue of material fact exists surrounding the existence of an agency relationship, the grant of summary judgment was improper. It is within the province of the jury to decide whether Bueto was an agent of Shell since that fact is in dispute. Therefore, we reverse and remand for a trial on the merits.
¶ 20. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS REVERSED AND REMANDED FOR A TRIAL ON THE MERITS. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLEE.
BRIDGES, IRVING, LEE, AND PAYNE, JJ., CONCUR. McMILLIN, C.J., DISSENTS WITH SEPARATE OPINION JOINED BY SOUTHWICK, P.J., MOORE, AND THOMAS, JJ.
McMILLIN, C.J., DISSENTING:
¶ 21. I dissent from the decision of the majority. This case is controlled by the decision rendered by the Mississippi Supreme Court in Levine v. Standard Oil Co., 249 Miss. 651, 653, 163 So.2d 750, (1964). That case involved a claim against Standard Oil for injuries suffered by a customer of an individually run service station operating under the Standard Oil logo. The principal distinguishing feature between the case now before us and Levine is that, in this case, the connection between the distributor of the branded petroleum products offered for sale on the defendant's premises was even more tenuous than in Levine. The majority, by suggesting that a legitimate fact issue of actual agency exists in this case, simply ignores precedent that is binding on this Court.
¶ 22. In Levine, the operator of a service station leased the premises directly from Standard Oil. All of his employees wore uniforms emblazoned with the words "Standard Oil." The operator purchased his gasoline at wholesale from Standard Oil for re-sale at retail on the station premises. The premises themselves were marked by a large "Standard Oil" sign and the general appearance of the station was similar to other company-owned service stations. Id. 249 Miss. at 654, 163 So.2d at 751. Despite all of these connections, the supreme court affirmed the trial court's decision to grant Standard Oil a peremptory instruction. Id. The supreme court concluded that the station lessee and operator "was not an agent or employee of *730 Standard Oil under these facts. He was an independent contractor." Id.
¶ 23. The majority of the Court today largely ignores the striking similarities between this case and Levine and instead places substantial reliance on the 1931 case of Kisner v. Jackson, 159 Miss. 424, 132 So. 90 (1931). Kisner dealt with the question of whether a lessee of a sawmill operation was, in fact, the employee of the mill owner. That case turned largely on the fact that the mill owner (a) was, by contract, able to dictate the specifications of the mill's output, (b) was the mill's only customer, and (c) could, under the terms of the contract, pay a price for the mill's output that was equal to the costs of production together with "an adequate salary to the alleged independent contractor...." Kisner, 159 Miss. at 428-30, 132 So. at 91. In that circumstance, the supreme court concluded that the alleged independent contractor was, in fact, nothing more than "a mere foreman or superintendent of the mill...." Id. 159 Miss. at 430, 132 So. at 91. Those circumstances offer little helpful parallel for our analysis in this case.
¶ 24. Prior to drawing any conclusion, the Kisner Court attempted to list a number of considerations that control the question of whether a master-servant relationship or an independent contractor relationship exists. It is only by the most strained interpretation of the facts of this case that the principles enunciated in Kisner are brought to bear by the majority. Chief among those problems is the proposition that, in the case now before us, there can be no real claim that the truck stop operator acted as either a contractual agent or a contractual independent contractor as to Shell Oil, since there was no contractual relationship at all existing between the two entities. Shell's coercive power to require certain minimum standards of operation at the truck stop-the only power of control enjoyed by Shellwere assertable by Shell only against its jobber. Any enforcement of Shell's requirements against the truck stop operator could come only from the jobber.
¶ 25. By way of further example of the difficulties encountered by the majority to analyze this case under Kisner, the majority suggests that Shell Oil furnished "the means and appliances for the work" in this case. See Id. 159 Miss. at 428, 132 So. at 91. The majority reaches this conclusion by pointing out that Shell sold the station operator the fuel and related products that were, in turn, resold by the operator to the general public.
¶ 26. Furnishing the means and appliances for the work to be done is one of the time-honored means of helping to determine whether a particular laborer is or is not an employee of the beneficiary of the worker's labor. This consideration refers to the actual tools and devices used by the worker to accomplish his objective. It is a substantial misapplication of that concept, useful as the concept may be in the proper case, to attempt to stretch it so far as to say that a wholesaler engaged in an armslength commercial transaction of selling product to a retailer for resale to the general public has furnished the "means and appliances" by which that retailer accomplishes the objectives of his business. Viewed in that light, every product wholesaler in the country bears the risk of being found to be in a principal-agent relationship with each and every customer that the wholesaler has. That is a notion that simply will not stand up to logical analysis.
¶ 27. In this case, Shell did not have any direct supervision or control over the operation of the truck stop operation. Its only right, were it convinced that its company image was suffering due to shoddy operation of the station, was to require the jobber to withdraw the Shell logo from *731 display on the premises. In Levine, the supreme court held that even the drastic remedy of termination of the lease would not, standing alone, give rise to a masterservant relationship. Levine, 249 Miss. at 655, 163 So.2d at 751.
¶ 28. Shell reserved the right to periodically inspect this business bearing Shell's logo and dispensing Shell products. It reserved the further right to impose some form of commercial sanction if the business was performing in a substandard manner that could reasonably be seen as damaging Shell's brand name. The mere fact that Shell, for the purpose of protecting the good will associated with its brand name, contractually insisted upon certain standards of operation of any enterprise desiring to advertise the fact that it sold Shell product does not constitute the right of control of the day-to-day management of a business enterprise that would give rise to principal-agent relationship.
¶ 29. By suggesting that the right of inspection, accompanied by the possibility of commercial sanctions if certain standards are not maintained, can create an issue of fact of whether an agency relationship has been created this Court, in one fell swoop, has fundamentally altered essentially every franchise operation within the State of Mississippi. I cannot endorse such a fundamental upheaval in the law of principal and agent when the long-standing precedent that binds this Court compels a different result.
¶ 30. There is no real issue of an actual principal-agent relationship in this case. The only possible justiciable issue is one of apparent agency, which could arguably be said to have been created by the prominent display of the Shell logo at the truck stop. However, just as any issues of actual agency are answered by the Levine case, so too are any questions of apparent agency since the possibility that a member of the public might incorrectly be led to believe that he was dealing with an entity owned and operated by the distributor was at least as great, if not greater, in Levine as it was in the case now before us. Yet the supreme court made clear in Levine that the mere display of brand name signage, no matter how prominent, is not sufficient to give rise to a potential claim of an apparent agency relationship where none, in fact, exists contractually. Any change in the principles enunciated in Levine must come from a source other than this Court.
¶ 31. I would affirm the judgment of the trial court.
SOUTHWICK, P.J., MOORE AND THOMAS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.