SOUTHWICK, J.,
for the Court.
¶ 1. Kossuth Trucking, Inc. brought suit against Caterpillar, Inc. alleging that an engine in one of Kossuth’s trucks was negligently repaired by a mechanic for whom Caterpillar was responsible. Caterpillar was granted summary judgment based on the trial court’s conclusion that the mechanic was not Caterpillar’s agent. We agree and affirm the judgment.
FACTS
¶2. The object at the center of the parties’ dispute is the engine in a 1993 Freightliner truck. In May 2000, the previous owner (the grandfather of the owners of Kossuth) sent the truck to N & N Diesel Service of Corinth so that its Caterpillar engine could be rebuilt. This repair work was performed after the Caterpillar warranty of five years and 500,000 miles had expired. Kossuth bought the truck in October 2000. The next month, a truck repair shop in Little Rock, Arkansas called MHC Kenworth performed repairs to the engine. Tony Mask, who along with his brother, Terry, owns Kossuth, testified that the engine was rebuilt several times in the months following the MHC repair work, until finally the truck was taken out of use indefinitely. The only evidence from Kossuth on causation was that MHC mechanics used faulty parts, but there was no evidence that these were Caterpillar parts.
¶3. Kossuth filed suit in September 2002, naming only Caterpillar, Inc. as a defendant. Kossuth alleged breaches of implied and express warranties by Caterpillar, as well as breach of contract. In June 2005, Kossuth filed an amended complaint which added language alleging vicarious liability by Caterpillar for negligence in repair work performed by MHC, as well as improper training of the MHC mechanics. Caterpillar’s motion for summary judgment was granted in September 2005.
¶ 4. The trial court’s findings of fact relied on Kossuth’s expert that MHC use of faulty parts for the repair created the problem. The court found that MHC mechanics were trained by J.A. Riggs Tractor Company, and not by Caterpillar. The court found no written agreement with MHC or other source of Caterpillar liability. MHC was merely a “second-level dealer” of Caterpillar products and an independent contractor. Since there was no evidence of an agency relationship between Caterpillar and MHC, summary judgment was entered. We now consider Kossuth’s appeal.
DISCUSSION
¶ 5. On appeal, Kossuth argues that there was a sufficient “connection” between Caterpillar and the business that conducted the repairs, MHC Kenworth, to “hold that there was an agency relationship between them under the case law.” Though Kossuth named only Caterpillar in its suit, the Caterpillar dealer, J.A. Riggs Tractor Co., and the second-level dealer MHC are the entities through which Kossuth must proceed to reach Caterpillar. Kossuth’s appellate arguments center on case law defining tort liability of principals for the acts of agents. Kossuth argues that there are disputed issues of material fact requiring reversal on the general question of agency.
¶ 6. Riggs and MHC are tractor-trailer dealerships and service centers located in Little Rock, Arkansas. Both Riggs and MHC sell Caterpillar and other tractor-trailer trucks, as well as provide service for all types of tractor-trailer trucks. Caterpillar manufactures many of the engines that are installed in these tractor-trailer *906 trucks, as well as replacement parts for these engines.
¶ 7. Caterpillar defines Riggs as a “dealer” of its products and MHC as a “second-level dealer” of its products. Caterpillar has no contracts with second-level dealers. MHC performed the repair work on the Caterpillar engine which ultimately led to this litigation. MHC is an authorized “second-level dealer” for Caterpillar. Riggs entered into a contract with Caterpillar called the “Caterpillar Distribution Agreement for Engines, Parts and Service.” Caterpillar’s only agreement with MHC was to grant restrictive use of the Caterpillar trade and service marks.
¶ 8. Kossuth arguesThat summary judgment was improper because it had demonstrated the existence of a fact question as to whether Caterpillar was vicariously liable for the work performed on Kossuth’s Caterpillar engine. Kossuth relies on a theory of agency to impute to Caterpillar any alleged negligence in MHC’s repair work.
¶ 9. Kossuth argues that the deposition of Caterpillar’s' representative, Joseph Saver, and the Caterpillar distribution agreement are evidence of an agency relationship between Caterpillar and MHC. Most of Saver’s deposition explained that second-level dealers have no direct relationship with Caterpillar. Second-level dealers have Caterpillar parts as inventory and their technicians perform repair work on Caterpillar engines. Caterpillar does not warrant the work performed by second-level dealers. Caterpillar does not provide training- for the mechanics and technicians of the second-level dealer or require them to use Caterpillar parts. In his deposition, Joseph Saver explained that he had no direct knowledge of the Riggs and MHC arrangement. He testified that a second-level dealer will “in most cases” contact the dealer and “request to be authorized to provide parts and service for Caterpillar engines.”
¶ 10. Saver stated that Caterpillar requires dealers to attend training workshops at the Caterpillar headquarters in Illinois. The second-level dealers are required by virtue of the distribution agreement to have personnel who have been trained by the dealer’s trainers, but that training would not occur at Caterpillar headquarters. Saver testified that Caterpillar did not issue warranties on the work of second-level dealers. Saver also stated that second-level dealers bought replacement parts for repair directly from dealers and never from Caterpillar itself.
¶ 11. Kossuth finds support for its position that there was an agency relation primarily in a precedent of this Court. Miller v. Shell Oil Co., 783 So.2d 724 (Miss.Ct.App.2000). There, we reversed a summary judgment in favor of Shell Oil Company. We found a fact question as to whether an agency relationship existed between Shell and a truck stop that we described as a “Shell branded station” leased by a third party. Id. at 729. The plaintiff had slipped on oil or fuel near the fuel pumps. The court majority found that a fact question existed as to whether Shell had a measure of control over the operation of the independently owned station. Id. at 728.
¶ 12. As Kossuth discusses, we relied in Miller on ten factors identified in a 1931 precedent. Kisner v. Jackson, 159 Miss. 424, 427, 132 So. 90, 91 (1931). Kisner was an employee of a saw mill who had been injured at the mill. The issue was whether the person operating the mill was an independent contractor or an agent of the owner. Id., 159 Miss, at 426-27, 132 So. at 90-91. In Miller, we examined the Kisner factors. Shell supplied its brand of fuel to the truck stop, required that the Shell fuel be used exclusively, retained a right of *907 inspection, had “control of the premises, the right to prescribe and furnish the details of the kind and character of work to be done, and the right to direct the details in the manner in which the work is done.” Miller, 783 So.2d at 727.
¶ 13. In Kisner, Justice V.A. Griffith identified these factors which we then employed in Miller:
Whether the principal master has the power to terminate the contract at will; whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment; whether he furnishes the means and appliances for the work; whether he has control of the premises; whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output; whether he has the right to prescribe and furnish the details of the kind and character of work to be done; whether he has the right to supervise and inspect the work during the course of the employment; whether he has the right to direct the details of the manner in which the work is to be done; whether he has the right to employ and discharge the subemployees and to fix their compensation; and whether he is obliged to pay the wages of said employees.
Id. (quoting Kisner, 159 Miss, at 428-29, 132 So. at 91). Kisner said that no general ranking of the factors could be made, since “the weight of each, and whether much or little, rising and falling in the scale as it may or may not be counterbalanced by one or more of the remaining tests,” would vary from case to case. Id.
¶ 14. We step back briefly from the ten-factor forest and examine just what these tests are trying to understand. Such decisions as Kisner are part of the larger and frequent analysis of the relationship between a direct actor who allegedly caused some damage to a plaintiff and other possible parties who should share in liability. A law journal article puts this issue in context:
There are three traditional classifications of employment relationships in which a hiring party employs a secondary party to perform work or service. These relationships are often referred to as (1) principal/agent; (2) master/servant; and (3) independent contractor. The classification of these employment relationships is significant since the hiring party’s liability is often predicated upon the status of the employment relationship. It is generally accepted that the principal and the master are subject to liability for the actions of their agents and servants, respectively. However, the hiring party in an independent contractor relationship may be protected from liability arising from the actions of the independent contractor.
Deanne Mosley & William C. Walter, The Significance of the Classification of Employment Relationships in Determining Exposure to Liability, 67 Miss. L.J. 613, 615-16 (1998).
¶ 15. As these authors discuss, there has been a proliferation of tests with varying factors that are used to identify the relationships. The Mississippi Supreme Court even once referred to this area as a “twilight zone.” Id. at 617, 132 So. 90 quoting Fruchter v. Lynch Oil Co., 522 So.2d 195, 199 (Miss.1988). With all the variations in tests, and despite some indications already mentioned that none of the factors are more important than the others, the principal focus now is on the issue of control. Mosley & Walter, Employment Relationships, at 618; Fruchter, 522 So.2d at 199. Indeed, a majority of the Kisner factors are aspects of the issue of control.
*908 ¶ 16. An important decision in this area is Levine v. Standard Oil Co., 249 Miss. 651, 163 So.2d 750 (1964). Standard Oil Company leased a service station to an operator. All of the station’s employees wore uniforms emblazoned with the words “Standard Oil.” The operator purchased his gasoline at wholesale from Standard Oil for retail sale on the station premises. The premises themselves were marked by a large “Standard Oil” sign and the general appearance of the station was similar to other company-owned service stations. Despite these facts, the Mississippi Supreme Court affirmed the trial court’s decision to grant Standard Oil a peremptory instruction. The Court concluded that the station operator was an independent contractor and not an employee of Standard Oil. In Miller, this Court’s majority distinguished Levine, finding that its facts did not constitute control by Standard Oil over the operation of the gas station. In Miller we put substantial weight on the fact of the Shell signs because “the premises of the Bogue Chitto Truck Stop was arranged so that members of the consuming public thought they were dealing with Shell.” Miller, 783 So.2d at 728. If customers reasonably would believe due to signs and other evidence that they were dealing with Shell, a contract creating an independent contractor relation with the station owner would not block Shell’s liability. Id. at 729, citing Fruchter, 522 So.2d at 199. A dissent found no distinction between Miller and Levine. Miller, 783 So.2d at 729 (McMillin, C.J., dissenting).[1]
¶ 17. In the years since the 1931 Kisner decision that enumerated the factors that we used in Miller, other considerations have been added. For example, when an independent contractor arrangement exists in a situation involving “employment generally performed” between an employer and employees, courts will decide as to third party rights whether public policy should override the independent contractor status. Richardson v. APAC-Mississippi, Inc., 631 So.2d 143, 150 (Miss.1994). Miller did not discuss Richardson, but Miller’s focus on the Shell signs makes it clear that the expectations issue played a significant role in the result. A threshold requirement for the public policy exception is that, absent a finding of agency, the injured party will be “denied an adequate legal remedy.” Id.; Mosley & Walter, Employment Relationships, 67 Miss.L.J. at 626-27. There are adequate remedies if suit against Caterpillar is barred, so public policy will not intervene here.
¶ 18. Insofar as the applicability of the Miller analysis, it is significant that MHC was not holding itself out as “MHC-Caterpillar Truck Repair,” or in some manner analogous to a Shell service station presenting itself as strictly a franchise of a national company. The contract between Caterpillar and Riggs prohibited Riggs from using “Caterpillar” as part of its business name. The agreement on trademarks that Caterpillar entered with MHC made the same prohibition. There has not been an argument here and certainly no evidence that the MHC business created the same visual connection with Caterpillar that the service station in Miller had with Shell Oil Company.
¶ 19. We should also not lose sight while examining signs, that even in the case Miller relied upon to discuss what the *909 public would reasonably believe after seeing the signs of a well-known company such as Standard Oil, the court still found that the key consideration for whether the trademark holder is responsible for torts on the premises is the actual control that the national company has over the operations at the specific location. Fruchter, 522 So.2d at 199.
¶20. We leave the Richardson and the implicit Miller public policy issues behind, and examine the central question of Caterpillar’s control over MHC’s repairs. Kossuth concedes that there was no contract between Caterpillar and MHC. Kossuth argues that the contractual relationship between Caterpillar and its first-level dealer, Riggs, imposed obligations on Caterpillar when Riggs entered agreements with second-level dealers. Section 7 of the Caterpillar-Riggs contract stated this, with the shorthand of “Company” referring to Caterpillar and “Dealer” to Riggs:
7. (a) In order to increase the availability of parts and mechanical service to those users of products who are not adequately served by existing facilities, Dealer agrees to appoint second level dealers throughout Dealer’s service territory described in Exhibit A. Dealer agrees to appoint as second level dealers only individuals, partnerships or corporations performing designated service functions, and to appoint them in such numbers, at such locations and for such selected models as to provide complete and adequate parts availability and mechanical service for such users. Dealer agrees that it is in the interest of both dealer and company that all second level dealers be responsible, of good reputation and capable of providing prompt, efficient and high quality service to users. Dealer agrees to inform Company concerning the appointment of any second level dealer and the termination of second level dealers previously appointed, and will from time to time report such information concerning each second level dealer appointed by Dealer as Company may request.
Company will make available to Dealer suggested forms of second level dealership agreements. The use of these forms by Dealer is optional, but agreements with second level dealers shall be in writing and include the substance of the appropriate Company-suggested form.
(b) Dealer agrees to:
(i) require second level dealers appointed by Dealer to provide the services, maintain the parts inventories and have available the specialized tools specified by Company;
(ii) maintain an adequate supply of parts and tools necessary to permit second level dealers appointed by Dealer to meet their parts and tool obligations;
(iii) provide training in the repair and maintenance of selected models for personnel of second level dealers appointed by Dealer as specified by Company;
(iv) provide other assistance to second level dealers appointed by Dealer as Company may specify.
¶ 21. The distribution agreement stated that dealers were independent contractors and not agents. Even so, Kossuth would have us find a fact question here because Caterpillar imposed on dealers an obligation to provide various kinds of assistance to second-level dealers such as MHC. We examine this evidence from the perspective of each of the Kisner factors:
(1) The first factor is whether Caterpillar had the power to terminate the relevant contract at will. The only contract between the two companies concerned the use of a trademark. Even if that agree *910 ment was cancelled, MHC would remain open under the same name and operating in the same way, including using Caterpillar parts, but it no longer would have Caterpillar signs.
(2) The only manner in which Kossuth says that Caterpillar affected the price was for warranty work, but the Kossuth repair was not under a Caterpillar warranty.
(3) There are some Caterpillar tools that are used in warranty work, but there was no requirement that they be used on non-warranty repairs or evidence that they were used here.
(4) There is no evidence that Caterpillar had any control over MHC’s premises.
(5) Since this was non-warranty repairs, there was no requirement that MHC use Caterpillar parts. Tony Mask, the eo-owner of Kossuth, testified that he did not recall whether MHC had even used Caterpillar parts in this repair.
(6) Whether Caterpillar had the right to require repairs to be conducted in certain ways is the most important connection between Caterpillar and MHC that Kossuth can find. Because of the paragraph we quoted above in the contract between Caterpillar and its dealer Riggs (not a contract with MHC), Kossuth argues that Caterpillar required its dealers to train second-level dealers in the making of repairs. Service manuals were provided from Caterpillar that reveal how certain repairs should be made. The only evidence in the record, though, is that Caterpillar did not require that all service technicians at a second-level dealer be trained by the dealer, and it did not require that only the trained technicians perform non-warranty work. The Kisner factor of “prescribe” the details of the work was not met here, though Caterpillar may well have guided some of the work.
(7) Kossuth acknowledges that though there was no continuous or even particularly frequent supervision of the work, if a dealer asked Caterpillar to go to a second-level dealer’s premises and inspect the work, Caterpillar had the right to do so.
(8) Insofar as the Kisner factor of having a right to “direct the details of the manner in which the work is to be done” is different than the sixth factor of “prescribe and furnish the details of the kind and character of the work to be done,” we find that our earlier conclusion under the sixth factor nonetheless applies. Caterpillar had some involvement in giving guidance and requiring the dealer to provide training, but how the second-level dealer employed those technicians on non-warranty work was not something over which Caterpillar retained any control.
(9) & (10) Kossuth concedes that Caterpillar had no right to employ, discharge, or fix compensation for MHC employees, nor does it pay the wages of those employees.
¶ 22. Very few of these Kisner factors indicate that Caterpillar had any control over MHC, and even the few factors that have some relevance are not met in full. Kossuth may have been aware of that problem when it concludes its argument by asserting that the determining factor is what the public perceived the relationship to be. We have already discussed, though, why the facts of this case are not analogous to those of the Shell service station in Miller.
¶ 23. The issue of whether there was a sufficient relation between Caterpillar and MHC is a question of fact. Miller, 783 So.2d at 727. Yet summary judgment is proper unless there are disputed issues of material fact. M.R.C.P. 56.
¶ 24. This case concerns a truck engine that was well passed the terms of its warranty. It was rebuilt by a company other *911 than Caterpillar. The rebuilt engine soon needed additional repairs by another company other than Caterpillar. Kossuth’s expert believed that MHC mechanics were the cause of the damage because of their decision to use faulty parts, and there was no evidence that these were Caterpillar parts. Kossuth’s adequate legal remedy was not against Caterpillar.
¶ 25. Though Kossuth attempts to make Caterpillar the responsible party, we find no genuine issue of material fact to continue the suit beyond summary judgment. We affirm.
¶ 26. THE JUDGMENT OF THE AL-CORN COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION.

. Whether the dissent was correct or not, it is at least noteworthy that the Mississippi Supreme Court acknowledged that the “difficulty in applying these tests can been seen where this Court on quite analogous factual situations has reached opposite conclusions.” Richardson v. APAC-Mississippi, Inc., 631 So.2d 143, 149 (Miss.1994).