970 So.2d 157 (2006)
Stephen W. MILLER, Appellant,
v.
R.B. WALL OIL COMPANY, INC., Appellee.
No. 2005-CA-01966-COA.
Court of Appeals of Mississippi.
December 12, 2006.
Rehearing Denied May 1, 2007.
David N. Gillis, Wayne E. Ferrell, Jackson, attorneys for appellant.
Roy A. Smith, Melton James Weems, Jackson, attorneys for appellee.
Before LEE, P.J., IRVING and ISHEE, JJ.
IRVING, J., for the Court.
¶ 1. This appeal arises out of a slip-and-fall claim initiated against R.B. Wall Oil Co. (Wall Oil) by Stephen Miller.[1] According to Miller, he slipped and fell at a gas station leased to Mary Jo Bueto by Wall Oil. This appeal concerns only Wall Oil's liability for Miller's injuries. After discovery, the Hinds County Circuit Court granted summary judgment on Wall Oil's behalf. Miller appeals, and asserts that the grant of summary judgment was in error. Miller also challenges the trial court's determination that he is not entitled to an award of punitive damages, and claims that he is entitled to reasonable expenses for his appeal.
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. On January 12, 1995, while fueling his truck, Miller slipped and fell in oil on the ground at the Bogue Chitto Truck Stop. The oil was on the ground prior to Miller's arrival at the truck stop. Miller allegedly fell in the oil as he went to shut off the fuel being pumped into the other *159 side of his truck. Miller claims that the automatic shut-off feature of the pump fueling the other side of his truck was inoperative, and he fell as he went to manually shut off the pump.
¶ 4. Donnie McWilliams was at the truck stop fueling his own truck at the time of Miller's fall. After McWilliams saw Miller slip, he went to help Miller up. At that time, both men went inside and Miller informed an employee of the truck stop that he had fallen in some oil. According to Miller, the employee told him that they were aware of a problem with the non-functioning automatic shut-off, and that someone had already been called to deal with the problem.
¶ 5. McWilliams testified at his deposition that he had had a problem with a malfunctioning automatic shut-off pump about a week before Miller's accident. McWilliams testified that he had informed the truck stop about the problem. Although he initially testified that he was not sure whether the pump he had used was the same pump that Miller was using on the day of the accident, he later recalled that the pump that had malfunctioned during his use was missing the handle-lock that allows a customer to pump gas without holding the pump. By contrast, the pump that allegedly overflowed at the time of Miller's accident had a functioning handle-lock, because McWilliams agreed that Miller was not at the pump at the time of the alleged malfunction of the automatic shut-off. Therefore, the pump that malfunctioned on McWilliams roughly a week prior to Miller's accident was not the same pump that allegedly malfunctioned at the time of Miller's accident.
¶ 6. According to Bueto's deposition, the pumps at the gas station were inspected every four hours by the fuel station attendant. The inspections began at six in the morning. Bueto testified that, although she could not remember the time of the accident, she was certain that the accident had not occurred at night. Bueto testified that these inspections specifically included looking for spills and other dangerous conditions. Bueto indicated that she had no knowledge of any problem with the shut-off feature of any of the pumps in the time leading up to Miller's accident. As she noted, she had "to pay for all the fuel that comes out of the pump. If it's on the ground, I got to pay for it. I mean, you know, I don't want it spilled." Bueto also testified that she examined the pump that Miller had been using after Miller's accident, and could find nothing wrong with it. The truck stop continued to use the allegedly malfunctioning pump without any complaints by other customers. Bueto indicated that, to the best of her recollection, Miller told her that he had slipped and had fallen in some oil as he ran to shut off the pump he was using, which was overrunning onto the ground. Bueto testified that she went outside to look around after Miller's fall and observed "some fuel spilled out on the concrete." She qualified, however, that the spill "wasn't very wide."
¶ 7. Jason Miller (no relation to Stephen Miller), the employee that Miller spoke to immediately after his fall, testified in his deposition that he remembered Miller coming in to say that he had fallen, but Jason could remember little else about their exchange. Jason testified that he did not remember what he had said back to Miller after Miller told him that he had fallen. Jason indicated that Miller had simply told him that Miller had fallen. Jason testified that he did not recall Miller saying anything about falling in oil or about a malfunctioning pump. Jason testified that he went outside after Miller left the truck stop, but could not find any significant oil spills, although he saw "little *160 spots" of oil. Jason also testified that he had received no other complaints of oil on the ground prior to Miller's accident.

ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 8. When reviewing a trial court's grant or denial of a motion for summary judgment, our standard of review is de novo. Webb v. Braswell, 930 So.2d 387, 395(¶ 12) (Miss.2006). The party moving for summary judgment bears the burden of showing that no genuine issue of material fact exists, while "the non-moving party is given the benefit of the doubt as to the existence of a material fact." Id. (citing McCullough v. Cook, 679 So.2d 627, 630 (Miss.1996)). When reviewing the record, we will "view the evidence in the light most favorable to the party opposing the [summary judgment] motion." Id. (citing Stallworth v. Sanford, 921 So.2d 340, 341-42(¶ 5) (Miss.2006)). If there is no genuine issue of material fact as to any element of a claim, summary judgment is proper. Id.; see also Cothern v. Vickers, Inc., 759 So.2d 1241, 1245(¶ 6) (Miss.2000).
1. Agency
¶ 9. Miller claims that the evidence introduced at trial shows a genuine issue regarding whether Bueto acted as Wall Oil's agent in the operation of her truck stop. Wall Oil claims that it did not exercise sufficient control over Bueto to make her its agent.
¶ 10. In 1931, the Mississippi Supreme Court expounded a non-exclusive list of factors that are to be used in determining whether an agency relationship exists:
Whether the principal master has the power to terminate the contract at will; whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment; whether he furnishes the means and appliances for the work; whether he has control of the premises; whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output; whether he has the right to prescribe and furnish the details of the kind and character of work to be done; whether he has the right to supervise and inspect the work during the course of the employment; whether he has the right to direct the details of the manner in which the work is to be done; whether he has the right to employ and discharge the subemployees and to fix their compensation; and whether he is obliged to pay the wages of said employees.
Kisner v. Jackson, 159 Miss. 424, 428-29, 132 So. 90, 91 (1931) (emphasis added). Although several of these factors do not weigh in favor of a determination of agency in this case, others weigh strongly toward a determination of agency. For example, there is significant evidence that Wall Oil regularly inspected Bueto's operation of the gas station. According to Bueto, official inspections were made at least weekly, and unofficial visits by Wall Oil employees occurred almost every day. Bueto testified that she believed that the purpose of these daily visits was to observe and inspect her operation of the truck stop. More troubling is Bueto's clear testimony that Wall Oil set the price of her gasoline. Bueto testified that she had regular, frequent contact with Wall Oil regarding the price she could set for her gas. Bueto indicated that she could not change the price of her gas without permission from Wall Oil. Furthermore, we note that Wall Oil received half of the profits from Bueto's sale of gas to customers of the truck stop.
¶ 11. Both Miller and Wall Oil direct our attention to Fruchter v. Lynch Oil Co., *161 522 So.2d 195 (Miss.1988). In that case, Fruchter was at a gas station filling her bicycle tires with air when she was burned by hot water that spewed from a car's radiator as a gas station attendant removed the radiator's cap. Id. at 196-97. As a result of her injuries, Fruchter sued Lynch Oil, which was leasing the gas station for operation by a third party, Robert Keel. Id. The Mississippi Supreme Court examined the issue of whether Lynch Oil could be held liable as a principal for its role in leasing the gas station to Keel. Id. at 198. The court noted that control and the right to control are the key issues that must be addressed in an agency determination. Id. at 199. Ultimately, the court determined that Fruchter had failed to prove a genuine issue of material fact regarding whether Lynch Oil could be held liable as a principal. Id. at 200-01. In so holding, the court noted several relevant facts:
Lynch Oil Company is a closely held family corporation chartered in the state of Mississippi. The company serves as a distributor for Shell Oil Company. . . . The real property and improvements at By-Pass Shell are owned by George Lynch, Jr., and George Lynch, III, both stockholders in Lynch Oil. The underground gas reservoirs and the pumps at By-Pass Shell are owned by Lynch Oil. Lynch Oil has owned or controlled the land, ground and buildings of By-Pass Shell for more than fifteen years but has never operated the gas station. Rather, Lynch Oil leases the pumps, tanks, land and building to the operator who under an oral agreement pays $ 1,000 a month and purchases gasoline daily. The operator "sets his own prices," "hires his own people," buys gas and some oil from [Lynch Oil], "but buys other items, e.g., filters and tires, from whomever. Lynch Oil supplies the station with all gasoline, more or less on a consignment basis, and the operator pays for the gas on a daily basis, keeping as a profit the difference between the wholesale price and the retail price.

* * *
Lynch Oil required that Keel keep By-Pass Shell open seven days a week. Beyond this Keel was required to operate the station as a Shell gas station and display only Shell signs. Shell Oil dealt directly with Lynch Oil. All credit card sales were routed through Lynch Oil with credit back from Shell Oil, rather than going directly from By-Pass Shell to Shell Oil.
The oral lease from Lynch to Keel contained no termination provisions. George Lynch, president of the corporation, understood that the corporation could terminate the lease if it was dissatisfied with the way Keel was operating the station and also that it had the right to approve or refuse any sale of the operating business by Keel to a third person.
Id. at 197 (emphasis added).
¶ 12. Both Miller and Wall Oil claim that Fruchter is particularly applicable to the present case. Wall Oil discusses the case at some length in its brief, eventually concluding that "[u]nder Fruchter, no agency was created between Shell, R.B. [sic] Wall Oil Company and [Bueto]." We agree that Fruchter bears many factual similarities to the present case. Notably, in both cases, the lessors retained no control over the hiring or paying of specific employees. However, we find the cases distinguishable in one particularly significant aspect. Keel, the operator in Fruchter, set his own prices and recovered, as profit, the difference between the amount he paid to Lynch Oil for his gas and the price of the fuel's resale to the public. *162 Fruchter, 522 So.2d at 197. By contrast, there was significant testimony from Bueto indicating that she did not, and could not, set her own prices. Additionally, Bueto split the profits from her sale of the gasoline with Wall Oil rather than recovering the entire profit of the sale of the gasoline herself. Essentially, it appears from the record that Bueto received gasoline from Wall Oil that she then sold, providing profit for both her business and for Wall Oil. Unlike Lynch Oil in Fruchter, Wall Oil in the present case did not gain profit only on the gasoline that was initially sold to the operator of the gas station; instead, it appears that Wall Oil took its profits from the gas sold by Bueto at the truck stop.
¶ 13. Agency matters are difficult to determine, because the question of whether a particular business relationship falls under agency principles is often a gray area. However, it appears to us that there are significant, material facts present, sufficient to prevent the grant of summary judgment, which indicate that Bueto may have acted as Wall Oil's agent in her operation of the Bogue Chitto Truck Stop. However, we find that Miller has failed to provide any genuine issue of material fact regarding another element of his claim. Therefore, a determination as to whether a genuine issue of material fact exists regarding any agency relationship is not outcome-determinative and need not be addressed further. Even if summary judgment was improperly granted on the ground of agency, summary judgment was still proper on another ground, as we explain below.
2. Notice
¶ 14. "A business owner or operator owes a duty to the invitee to keep its premises in a reasonably safe condition and to warn of dangerous conditions which are not readily apparent to the invitee. . . . If the dangerous condition was created by someone not associated with the operation of the store, the plaintiff must produce evidence demonstrating that the operator had actual or constructive knowledge of the condition." Drennan v. Kroger Co., 672 So.2d 1168, 1170 (Miss.1996) (citations omitted). A plaintiff need not prove notice if "the condition was created by the negligence of the proprietor or an individual acting under his authority." Id. at 1171 (citing Munford, Inc. v. Fleming, 597 So.2d 1282, 1284 (Miss.1992)).
¶ 15. Here, there was no evidence presented to indicate that the oil spill that Miller slipped in was caused by the negligence of the Bogue Chitto Truck Stop. There is no evidence whatsoever that an employee of the truck stop spilled the oil. Given that the location was a gas station, the most logical conclusion is that the oil was spilled by another customer of the gas station. Because there is no evidence that the spill was caused by the negligence of the employees of the truck stop, Miller can succeed only if he can show that there is a genuine issue of material fact regarding whether Bueto or her employees had notice of the spill.
¶ 16. There also is no evidence to indicate that the truck stop had actual or constructive knowledge of the spill. Although Bueto testified that the station's employees inspected the pump area every four hours, there is no evidence that one of these inspections would have occurred close in time to the time of Miller's accident. In fact, nothing in the record indicates exactly when Miller's fall occurred. Furthermore, Miller presented no evidence to indicate that the spill must have been on the ground for any length of time such that regular inspections should have detected. Although McWilliams testified that one could tell by looking at the spill that it had been there a while, nothing in *163 the record indicates that McWilliams has any sort of expertise with identifying and characterizing oil spills. Additionally, although McWilliams indicated that he thought that the oil spill had been there for some time, he did not present any estimate as to how long the spill had been there. We note that there is no evidence to indicate that other customers had complained to the truck stop's employees that there was an oil spill outside. Therefore, there has been no credible evidence presented to indicate that Bueto or her employees knew or should have known about the spill in question.
¶ 17. Miller contends that the station had notice that there was a problem with one of the pumps because McWilliams had had an incident with one of the pumps approximately a week prior to Miller's fall. However, we note that McWilliams was never able to adequately identify which pump he had used. Whatever pump it was, it is clear that the pump was not the same one that Miller was using at the time of his spill. There is no evidence to indicate that the pump that McWilliams had problems with was still malfunctioning at the time of Miller's fall, or that it was the pump that caused the oil spill that Miller slipped in. Therefore, McWilliams' report of a malfunctioning pump about a week prior to Miller's accident is not sufficient to provide a genuine issue of material fact regarding notice.
¶ 18. Finally, Miller points to his testimony that Jason, an employee of the truck stop, told him that the station was aware of a problem with the pump he was using. Deciding the admissibility of Jason's statement would require analysis under the rules governing hearsay. As we discuss in the succeeding paragraph, though, this statement even if admissible would be insufficient to deny summary judgment.
¶ 19. We have already noted that there are significant, material facts implicating an agency relationship between Bueto and Wall Oil, although our holding is not premised on a finding of agency. Regardless of how the agency issue might be resolved, there still would not be a genuine issue of material fact regarding the requisite notice to Bueto. Nothing in the statement attributed to Jason by Miller indicates that Wall Oil was aware of the existence of the oil spill that Miller slipped in. Further, there is no proof that the pump of which Jason allegedly spoke actually caused the spill.
¶ 20. Miller also contends that the truck stop could, "[a]t a minimum," put up signs warning customers of a dangerous condition. We have already found that Miller presented no evidence which would indicate that the truck stop had notice of the spill. Therefore, the truck stop cannot be held liable for the failure to warn.
¶ 21. Because there is no evidence to indicate that the oil that Miller slipped on was spilled as a result of the station's negligence, Miller must show actual or constructive notice on the part of the truck stop in order to overcome summary judgment. Since no genuine issue of material fact has been presented to support a finding of notice, summary judgment was properly granted against Miller, even though we disagree as to the basis relied on by the trial court. It is well-settled law that when a trial court has reached the right result, an appellate court may affirm the judgment of the trial court employing a different basis than the one upon which the trial court relied. Puckett v. Stuckey, 633 So.2d 978, 980 (Miss.1993).
3. Punitive Damages
¶ 22. Because we have found that summary judgment was properly granted, the trial court was also clearly correct in refusing *164 to grant punitive damages to Miller. This issue is without merit.
4. Costs of Appeal
¶ 23. Because we are affirming the trial court, and finding Miller's appeal without merit, we also find that he is not entitled to recover the cost of pursuing his appeal. Therefore, this issue is also without merit.
¶ 24. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] Miller has had two prior appeals before this Court regarding his accident, Miller v. R.B. Wall Oil Co., 850 So.2d 101 (Miss.Ct.App. 2002) (appeal dismissed because lower court's order not a final judgment) and Miller v. Shell Oil Co., 783 So.2d 724 (Miss.Ct.App. 2000) (reversed and remanded for trial on the merits).